Deborah **HAWS** for William **HAWS**, a minor, Plaintiff,

v.

Kenneth **APFEL**, Commissioner of Social Security, Defendant.

No. 97–1138–Civ–ORL–22C.

United States District Court, M.D. Florida, Orlando Division.

July 28, 1999.

William Earl Horne, Jr., Law Office of William C. Davis, Jr., Jacksonville, FL, for plaintiff.

Mary Ann Sloan, Chief Counsel, Office of the General Counsel, Region IV, Social

Security Admin., Atlanta, GA., for defendant.

Karen L. Gable, Asst. U.S. Atty., Orlando, FL.

## ORDER

CONWAY, District Judge.

This cause comes before the Court on the Complaint filed by Plaintiff seeking review of the final decision of the Commissioner of Social Security denying her application for Child's Supplemental Security Income benefits.

This matter was considered by the United States Magistrate Judge, pursuant to the general order of assignment, who has filed a report recommending that the decision of the Commissioner be reversed.

After an independent *de novo* review of the record in this matter, and noting that no objections were timely filed, the Court agrees entirely with the findings of fact and conclusions of law in the Report and Recommendation.

Therefore, it is ORDERED as follows:

1. The Report and Recommendation filed June 28,1999 (Dkt.18), is ADOPTED and CONFIRMED and made part of this Order.

2. The decision of the Commissioner is hereby REVERSED.

3. The Clerk is directed to enter judgment accordingly.

DONE AND ORDERED.

## REPORT AND RECOMMENDATION

GLAZEBROOK, United States Magistrate Judge.

Plaintiff Deborah Haws ("Haws") appeals to the district court on behalf of her minor son, William J. Haws, from a final decision of the Commissioner of Social Security [the "Commissioner" [1]] denying her application for Child's Supplemental Security Income ["SSI"] benefits. For the reasons set forth below, it is recommended that the decision be REVERSED.

1. For consistency, this opinion uses term "Commissioner" throughout, and not the for-

## I. PROCEDURAL HISTORY

The United States Supreme Court decided *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990), a case discussed below, on February 20, 1990. On March 28, 1994, Mrs. Haws filed her first application for Child's SSI on behalf of her son, alleging disability due to chronic asthma and developmental problems including eating, swallowing, walking, talking, running, and reaching. R. 68–70. Haws claimed that her son's disability began on December 29, 1992, the day he was born. R. 68. The Commissioner denied the application initially on June 28, 1994, and on reconsideration on November 10, 1994. R. 71–72, 75–76.

On January 3, 1995, Haws requested a hearing. R. 77–78. On January 22, 1996, the Honorable Apolo Garcia, Administrative Law Judge ("ALJ"), held a nine-minute hearing on Haws' claims, and heard testimony from Mrs. Haws. R. 59–67. On April 19, 1996, the ALJ issued a decision that William Haws was not entitled to SSI benefits because he had no impairment which met or equaled the severity of any impairment listed in Appendix 1, Subpart P, Regulation No. 4, and no functionally equivalent impairment. R. 26, Finding 3. The ALJ further found that Haws did not have an impairment of comparable severity to that which would disable an adult. R. 26, Finding 4. The ALJ concluded that Haws suffered from chronic respiratory difficulties which responded to medical treatment, and that Haws had developmental delays that involved swallowing. R. 26, Finding 2.

Effective August 22, 1996—after the ALJ's decision but before Appeals Council review—the United States Congress enacted a new definition of childhood disability intended to rectify deficiencies that the *Zebley* Court had observed in the Commissioner's regulations and procedures for determining childhood disability. 42 U.S.C. § 1382c(a)(3) (1996). Congress abandoned

mer title of Secretary of Health and Human Services.

the "comparable severity" standard, and redefined child disability as "a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months." *Id.* Congress expressly applied the *new* statutory definition to all claims awaiting review by the Appeals Council on August 22, 1996, including Haws' claim. *See* 110 Stat. 2105, 2189, P.L. 104–193, 1996 H.R. 3734.[2]

On appeal to the Appeals Council, Haws supplemented the record with additional evidence that he had **muscular dystrophy,** a debilitating disease likely to result in death by age 20. R. 4–5; 229–63. The Appeals Council considered the new evidence and the new diagnosis (together with the entire record previously submitted to the ALJ) in light of the statute, regulations, and rulings in effect as of July 29, 1997—i.e., in light of the new statutory definition of childhood disability and implementing regulations effective April 14, 1997. R. 5.

Based on the new law and new evidence, the Appeals Council issued its decision denying review of Haws' claim on July 29, 1997. R. 5–6. According to the Appeals Council, the ALJ had neither erred nor abused his discretion, and had relied on substantial evidence in the record to support his action, findings, and conclusions. R. 5. The Appeals Council further determined that the ALJ's actions, findings, and conclusions were not contrary to the weight of the evidence "currently of record" on July 29, 1997—i.e., presumably including the new evidence and the new diagnosis. R. 5. On appeal, Haws now challenges the Appeals Council's decision as error.

On September 18, 1997, Haws filed a complaint in the United States District Court for the Middle District of Florida seeking judicial review of "the decision of the Appeals Council of the Social Security Administration." Docket No. 1 at 1–2. Mrs. Haws filed her appeal brief on November 25, 1998 arguing that the Appeals Council had failed to recognize that the ALJ had abused his discretion, and that the ALJ had proffered a decision not supported by substantial evidence. Docket No. 13 at 2. Haws asked this Court to review, reverse, and set aside the Appeals Council's decision, and to grant Haws' claim. Docket No. 1 at 2.

The Commissioner filed his brief on February 3, 1999 noting that the new definition of childhood disability applied to Haws' claim. Docket No. 16. The Commissioner, however, argued that the Court should nevertheless affirm the ALJ in his application of the old "comparable severity" standard because application of the new definition based on marked and severe functional limitations imposed an even stricter standard for childhood disability. Docket No. 16 at 5–6. The Commissioner also argued that this Court must disregard the new medical evidence considered by the Appeals Council in making its final decision—including the new evidence of Duchenne muscular dystrophy—because the Appeals Council chose to deny review. Neither party requested oral argument. Docket No. 13.

## II. *THE STANDARD OF REVIEW*

■ The Commissioner's findings of fact are conclusive if supported by substantial evidence, 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would ac-

2. Next, the Commissioner promulgated new regulations implementing Congress' new statutory definition of childhood disability. *See* 20 C.F.R. §§ 416.902; 416.906; 416.924 through 416.926a. The new regulations be-

came effective on April 14, 1997. The new definition of childhood disability, as well as the new implementing regulations, apply to Haws's claim on judicial review.

cept as adequate to support the conclusion. *Foote v. Chater,* 67 F.3d 1553, 1560 (11th Cir.1995), *citing Walden v. Schweiker,* 672 F.2d 835, 838 (11th Cir.1982) and *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *accord, Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991).

■ Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan,* 937 F.2d 580, 584 n. 3 (11th Cir.1991); *Barnes v. Sullivan,* 932 F.2d 1356, 1358 (11th Cir.1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote,* 67 F.3d at 1560; *accord, Lowery v. Sullivan,* 979 F.2d 835, 837 (11th Cir.1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir.1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

■ The district court will reverse a Commissioner's decision on plenary review, however, if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services,* 21 F.3d 1064, 1066 (11th Cir.1994); *accord Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. *Bowen v. Heckler,* 748 F.2d 629, 631, 636–37 (11th Cir.1984).

■ The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g);

or under both sentences. *Jackson v. Chater,* 99 F.3d 1086, 1089 – 92, 1095, 1098 (11th Cir.1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson,* 99 F.3d at 1090–91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris,* 621 F.2d 688, 690 (5th Cir.1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

■ Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler,* 732 F.2d 827, 829–30 (11th Cir.1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler,* 721 F.2d 726, 729 (11th Cir.1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson,* 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court ... may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to

incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: 1.) that there is new, noncumulative evidence; 2.) that the evidence is material—relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090–92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir.1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir.1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir.1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir.1994).

 A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3] *Id.*

## III. *THE LAW OF CHILDHOOD DISABILITY*

### A. The Old "Comparable Severity" Standard for Childhood Disability

Before 1990, a child was "disabled" if he suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an adult from working. 42 U.S.C. § 1382c(a)(3) (1982). On February 20, 1990, the United States Supreme Court decided *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). The Supreme Court determined that the

Commissioner's childhood SSI disability regulations and rulings had failed to implement the SSI statute enacted by Congress. The regulations were manifestly contrary to the statute, and exceeded the Commissioner's statutory authority. 493 U.S. at 541, 110 S.Ct. 885.

The statute generally defined disability in terms of an individualized, functional inquiry into the effect of medical problems on an adult's ability to work—or in terms of a "comparable severity" in the case of a child. 493 U.S. at 528–29, 110 S.Ct. 885. The Commissioner, however, had established medical criteria for listed impairments that were more restrictive and more severe than the statutory standard for disability in order to operate as a presumption of disability that makes further inquiry unnecessary. 493 U.S. at 532–33, 539, 110 S.Ct. 885. An adult whose impairment did not meet the listings had the opportunity to show that his impairment in fact prevented him from working, but a child whose impairment did not meet the listings had no similar opportunity. 493 U.S. at 534–35, 110 S.Ct. 885.

The Supreme Court rejected the Commissioner's argument that a functional analysis of childhood disability was not feasible, and that a "listings-only" approach to childhood disability was the only practicable way to determine whether a child's impairment was "comparable." 493 U.S. at 539–40, 110 S.Ct. 885. After *Zebley*, the Commissioner "substantially liberalized" the childhood SSI eligibility regulations to provide for an individualized functional analysis. *See* S.Rep. No. 104–96, 104th Cong., 1st Sess.1995 (available on Westlaw at 1995 WL 351655).

The statutory and regulatory criteria in effect at the time of the ALJ's decision on April 19, 1996 regarding William Haws

---

**3.** The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n. 4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

required the ALJ to apply a four-step evaluation process to his claim. *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.924(b); *accord, Brown v. Callahan,* 120 F.3d 1133, 1134–35 (10th Cir.1997). First, the ALJ had to determine whether William Haws was engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(c). If so, he was not disabled. If William Haws was not engaged in substantial gainful activity, the ALJ had to determine whether he had a severe impairment. *See* 20 C.F.R. § 416.924(d). If not, he was not disabled. If William Haws had a severe impairment, the ALJ had to determine whether that impairment met or equaled an impairment listed in 20 C.F.R. Part 404, subpt. P, app. 1 ["the Listings"]. *See* 20 C.F.R. § 416.924(e). If the impairment met or equaled a listing, William Haws would be deemed disabled. *See id.* If not, the evaluation would proceed to the fourth step, in which the ALJ would make an individualized functional assessment ["IFA"] to determine whether William Haws had an impairment or impairments of comparable severity to that which would prevent an adult from engaging in substantial gainful activity. *See* 20 C.F.R. § 416.924(f); *accord, Brown,* 120 F.3d at 1134–35.

## B. The Legislative History Preceding the New Standard

No party has supplied the Court with any legislative history describing the advent of the new childhood disability standard. A cursory review of the legislative history, however, provides some context to this decision.

The Human Resources Subcommittee of the House promptly took note of the hold-ing in *Sullivan v. Zebley,*[4] and monitored both the Commissioner's implementation of the decision and the decision's effect on the Social Security Administration. H.R.Rep. No. 102–431, 102nd Cong., 2nd Sess.1992 (available on Westlaw at 1992 WL 35799); *accord,* H.R.Rep. No. 103–506, 103rd Cong., 2nd Sess.1994, 1994 U.S.Code Cong. & Ad. News 1494 (available on Westlaw at 1994 WL 188483). As a result of *Zebley,* the Social Security Administration expected to process about 240,000 retroactive *Zebley* claims; 75,000 reconsiderations; 33,000 hearings; and 7,000 Appeals Council reviews. The Commissioner expected to reevaluate 60,000 childhood disability claims denied since the decision, and expected an additional 125,000 blind or disabled children on SSI by the end of fiscal year 1992. *Id.* The Senate Committee on Finance later noted that "the *Zebley* decision was based on limited legislative history and obscure statutory language regarding the children's SSI program, which the Committee is now correcting." *See* S.Rep. No. 104–96, 104th Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 351655).

Congress most thoroughly articulates its intent in replacing the "comparable severity" standard with a new definition of childhood disability in the House Conference Report to P.L. 104–193, the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, dated July 30, 1996. *See* H.R.Conf.Rep. No. 104–725, 104th Cong., 2nd Sess.1996, 1996 U.S.Code Cong. & Ad. News 2649 (available on Westlaw at 1996 WL 443732 at 744).[5] The conference agreement on the definition of childhood disability provides as follows:

> age-appropriate daily activities of a child, such as speaking, walking, washing, dressing, feeding, going to school, playing, and all the other activities in which children normally engage. *Id.*

---

**4.** The Subcommittee summarized the *Zebley* holding as follows: 1.) in establishing the definition of childhood disability, Congress intended that the Commissioner perform an individualized assessment of the child's functioning when he decides whether the child is disabled, just as he must do for adults; and 2.) although a vocational analysis is inapplicable to children, a functional analysis may be applied to children through an inquiry into the impact of an impairment on the normal,

**5.** *Accord,* H.R.Rep. No. 104–651, 104th Cong., 2nd Sess.1996 (available on Westlaw at 1996 WL 393655 at 2957); H.R.Conf.Rep. No 104–350, 104th Cong., 1st Sess.1995 (available on Westlaw at 1995 WL 709269 at 3875–76).

The conference agreement follows the Senate amendment. The conferees intend that only needy children with severe disabilities be eligible for SSI, and **the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.** In those areas of the Listing that involve domains of functioning, the conferees expect no less than two marked limitations as the standard for qualification. The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe" in its common sense meaning.

In addition, the conferees expect that SSA will properly observe the requirements of section 1614(a)(3)(F) of the Social Security Act [42 U.S.C. § 1382c(a)(3)(G)] and ensure that the combined effects of all the physical or mental impairments of an individual under age 18 are taken into account in making a determination regarding eligibility under the definition of disability. The conferees note that the 1990 Supreme Court decision in Zebley established that SSA had been previously remiss in this regard. **The conferees also expect SSA to continue to use criteria in its Listing of Impairments and in the application of other determination procedures, such as functional equivalence,** to ensure that young children, especially children too young to be tested, are properly considered for eligibility of benefits.

The conferees recognize that there are rare disorders or emerging disorders not included in the Listing of Impairments that may be of sufficient severity to qualify for benefits. **Where appropriate, the conferees remind SSA of the importance of the use of functional equivalence disability determination procedures.**

Nonetheless, **the conferees do not intend to suggest by this definition of childhood disability that every child need be especially evaluated for functional limitations,** or that this definition creates a supposition for any such examination. **Under current procedures for writing individual listings, level of functioning is an explicit consideration in deciding which impairment, with certain medical or other findings, is of sufficient severity to be included in the Listing.** Nonetheless, the conferees do not intend to limit the use of functional information, if reflecting sufficient severity and is [sic] otherwise appropriate.

The conferees contemplate that Congress may revisit the definition of childhood disability and the scope of benefits, if deemed appropriate, and have provided elsewhere for studies on these issues.

H.R.CONF.REP. No. 104–725, 104th Cong., 2nd Sess.1996, 1996 U.S.CODE CONG. & AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744) (emphasis supplied). Congress created a Commission of Childhood Disability to further study the appropriateness of an alternative definition of childhood disability. *See* SEN.REP. No. 105–36(II), 105th Cong., 1st Sess.1997 (available on Westlaw at 1997 WL 374928 at 766).

### C. *The New "Functional Limitations" Standard for Childhood Disability*

#### 1. The New Act and Statute

On August 22, 1996, the President signed into law the Personal Responsibility and Work Opportunity Reconciliation Act, Pub.L. No. 104–193, 110 Stat. 2105—four months after the ALJ issued his decision denying Haws's claim, but before the completion of Appeals Council review. The Act amended the substantive standard for evaluating children's disability claims to read as follows:

An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a

medically determinable physical or mental impairment, **which results in marked and severe functional limitations,** and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C) (codification of the Act) (emphasis supplied). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). The statute does not define "marked and severe functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments. 42 U.S.C. § 1382c(a)(3)(G). In determining the disability of a child, the Commissioner must make reasonable efforts to ensure that a qualified pediatrician or other specialist evaluates the case. 42 U.S.C. § 1382c(a)(3)(I).

Section 211(d)(1) of the Act, Pub.L. 104–193, 1996 H.R. 3734, 110 Stat. 2105, 2190, found in the notes following 42 U.S.C. § 1382c, states that the new standard for evaluating children's disability claims applies to all cases which have not been finally adjudicated as of the effective date of the Act, August 22, 1996, including those cases in which a request for Appeals Council review is pending. *See also, Brown v. Callahan,* 120 F.3d 1133, 1134–35 (10th Cir.1997); *Nelson v. Apfel,* 131 F.3d 1228, 1234–35 (7th Cir.1997); *Jamerson v. Chater,* 112 F.3d 1064, 1065–66 (9th Cir.1997). Thus, the district court applies the new version of the Act to this case.

Congress also chose to directly change specific sections of the Commissioner's childhood SSI regulations. Section 211(b) of the Act contains the following uncodified changes to the regulations:

(b) CHANGES TO CHILDHOOD SSI REGULATIONS.—

(1) MODIFICATION TO MEDICAL CRITERIA FOR EVALUATION OF MENTAL AND EMOTIONAL DISORDERS.—The Commissioner of Social Security shall modify sections 112.00C.2. and 112.02B.2.c.(2) of appendix 1 to subpart P of part 404 of title 20, Code of Federal Regulations, to eliminate references to maladaptive behavior in the domain of personal/behaviorial function.

(2) DISCONTINUANCE OF INDIVIDUALIZED FUNCTIONAL ASSESSMENT.—The Commissioner of Social Security shall discontinue the individualized functional assessment for children set forth in sections 416.924d and 416.924e of title 20, Code of Federal Regulations.

Pub.L. 104–193, 1996 H.R. 3734, 110 Stat. 2105, 2189.

Congress evidently intended to exercise direct control over the details of the implementing regulations, even though Congress normally leaves these to the discretion of the responsible agency. Pursuant to the Act, references to "maladaptive behavior" have since been removed from the regulations. *See* superseded text of §§ 112.00(C)(2)(c) and 112.02(B)(2)(c)(2) in Part 404, Subpart P, App. 1 and 2. Effective April 14, 1997, the Commissioner also removed 20 C.F.R. § 416.924d and § 416.924e pertaining to individualized functional assessment for children. Congress also required the Commissioner to submit to Congress for review any final regulation pertaining to the eligibility of children for SSI benefits. Pub.L. 104–193, § 211(d)(4), as amended Pub.L. 105–33, § 5101, 111 Stat. 595.

**2. The New Regulations**

Under express statutory authority, 42 U.S.C. § 405(a), the Commissioner promulgates regulations governing eligibility for SSI benefits. 20 C.F.R. Part 416, Subpart I; *Crayton v. Callahan,* 120 F.3d 1217, 1219 (11th Cir.1997). Effective April 14, 1997, the Commissioner promulgated

detailed interim final rules to guide the implementation of the new statute. *See* Childhood Disability Provisions, 62 Fed. Reg. 6408 (1997); *accord, Nelson,* 131 F.3d at 1234–35. The regulations presently in force—and applicable to Haws's appeal—are codified at 20 C.F.R. §§ 416.902; 416.906; 416.924 through 416.926a.[6]

The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets or medically or functionally equals the severity of a listing in the Listing of Impairments in appendix 1 of subpart P of part 404 (the Listing)." 20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a. The Listing of Impairments describes disabling asthma. *See* §§ 103.03, of Part 404, Subpart P, App. 1.[7]

The regulations set forth the steps now used in determining disability for children. 20 C.F.R. § 416.924 (effective April 14, 1997):

> We follow a set order to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an

impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a). A child is not disabled if his impairments do not meet, medically equal, or functionally equal in severity a listed impairment. 20 C.F.R. § 416.924(d). Age, functioning, and other factors are evaluated in determining whether a child meets a listing. 20 C.F.R. §§ 416.924a–416.924c. If a child's impairments do not meet a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairments to determine whether the functional limitations are disabling. 20 C.F.R. § 416.926a (functional equivalence for children). Individualized functional assessments for children, however, have been eliminated. *See* 20 C.F.R. §§ 416.924d and 416.924e (discontinued).

### 3. Is the New Standard More Stringent?

After the enactment of the new statutory definition—but before the promulgation of the new detailed implementing regulations described above—the Commissioner issued emergency instructions determining that "[a]ny case that would have been denied under the prior standard would also be denied under the new standard." SSA Emergency Teletype No. EM–96–131 S III(a)(5); *Nelson v. Apfel,* 131 F.3d 1228, 1234–35 (7th Cir.1997); *Jamerson,* 112 F.3d at 1066; Childhood Disability Provisions, 62 Fed.Reg. 6408 ("[u]nder the new law, a child's impairment or combination of impairments must cause more serious impairment-related limitations than the old law and our regulations required.").

In his appeal brief, the Commissioner argues that "this new legislation adopts a stricter standard for disability in child's SSI claims." Docket No. 16 at 6. The Commissioner asks this Court to affirm his

---

**6.** The superseded text of all regulations appear in 20 C.F.R. following the revised text, if any.

**7.** Part B provides medical criteria applicable to children in those instances in which Part A does not give appropriate consideration to the particular disease process in childhood. *See* Parts A and B, Part 404, Subpart P, App. 1.

decision denying Haws claim because it would "necessarily follow" that a claimant properly found not disabled under the old law also would be found not disabled under the new "more stringent" standard. Docket No. 16 at 6. Several courts of appeals have accepted the Commissioner's argument that the new law is "more stringent," and have affirmed disability denials under the new law after finding that the ALJ had properly applied the old law. *See Walker v. Apfel,* 141 F.3d 852, 853 (8th Cir. April 9, 1998) (claimant properly denied benefits under old, less restrictive standard); *Briggs v. Callahan,* 139 F.3d 606 (8th Cir. 1998) (legislative history indicates that new statutory definition imposes a more stringent standard for disability); *Nelson v. Apfel,* 131 F.3d 1228, 1234–35 (7th Cir. 1997) (court of appeals defers to agency's reasonable interpretation that a claimant who was properly denied benefits under old standard would also be denied benefits under the new standard); *Lee v. Chater,* No. 96–3613, 1997 WL 559959, at *1 n. 1 (7th Cir.1997) (unpublished decision in table at 124 F.3d 204) (citing SSA Emergency Teletype No. EM–96–131, court of appeals finds new definition of disability more stringent than the old); *Brown v. Callahan,* 120 F.3d 1133, 1135 (10th Cir. 1997) (analysis on appeal stops after finding substantial evidence supporting ALJ's findings on first three steps because new version eliminates the fourth step: comparable severity); *Jamerson v. Chater,* 112 F.3d 1064, 1066, 1068 (9th Cir.1997) (citing SSA Emergency Teletype No. EM–96–131; court of appeals defers to agency's reasonable interpretation that the new standard is "more demanding" and "more stringent," but declines to interpret the precise effect of the new standard in advance of the impending rules); *see also, Quinones v. Chater,* 117 F.3d 29, 33 n. 1 (2d Cir.1997) (Commissioner waived any argument regarding applicability of new childhood disability definition to this case because he had not yet promulgated the new regulations).

 A district court normally will defer to an agency's reasonable interpreta-

tion. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Courts have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer); *accord, Jamerson v. Chater,* 112 F.3d 1064, 1065–66 (9th Cir.1997); *Nelson,* 131 F.3d at 1234–35. A district court will not defer, however, if the agency's interpretation is manifestly contrary to the statutory standard that the regulations purport to implement. *Sullivan v. Zebley,* 493 U.S. 521, 528, 541, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (Commissioner's pre–1990 childhood disability regulations did not carry out the requirement in the former statute that SSI benefits shall be provided to children with any impairment of comparable severity).

## IV. *ANALYSIS AND APPLICATION*

### A. Analysis of Relative Stringency

Haws contends that the Appeals Council erred as a matter of law in denying review: (1) by failing to find that William Haws met the severity of Listing 110.07(A); (2) by failing to consider the new evidence which demonstrated that he had functional limitations that met or equaled in severity a specific listed impairment; and (3) in determining that he did not have an impairment without considering a fully developed medical record. Docket No. 13. The Commissioner contends that substantial evidence supports the ALJ's findings under the old law, and that the Commissioner correctly found that William Haws did not have an impairment or combination of impairments of functional equivalence to any impairment listed in Appendix 1, Part A or B. Accordingly, the Commissioner argues that the ALJ's decision should be affirmed because the new law is more stringent. Docket No. 16.

The United States Court of Appeals for the Eleventh Circuit has never determined that the new statute and regulations are "more stringent" than the old statute and

regulations. The Eleventh Circuit has never determined that a district court may affirm a denial of benefits under the new statute and regulations in cases in which the ALJ property applied the old statute and regulations. The Eleventh Circuit has never determined that the district courts should defer to agency instructions issued in an "emergency teletype" before the Commissioner had an opportunity to carefully consider and promulgate detailed regulations.

Which version of the statute is "more stringent" is not readily apparent from a comparison of the old and new statutory language. Without considering more than the statutory language, one cannot determine which is more severe: 1.) an "impairment of comparable severity" to that which would prevent an adult from engaging in substantial gainful activity; or 2.) an "impairment which results in marked and severe functional limitations." *See* 42 U.S.C. § 1382c(a)(3)(C).

Similarly, one cannot determine whether the new statutory definition of childhood disability *as implemented by the new regulations* is generally more "severe" than the old statutory definition and post-*Zebley* regulations. Although the Commissioner has discarded the "comparable severity" regulations and the post-*Zebley* individualized functional assessment, 20 C.F.R. §§ 416.924d and 416.924e, the Commissioner has replaced those regulations with new regulations implementing the "marked and severe functional limitations" standard in the manner directed by Congress. Level of functioning in children is an explicit consideration in deciding which impairment is of sufficient severity to be included in an individual listing. H.R.CONF.REP. No. 104–725, 104th Cong., 2nd Sess.1996, 1996 U.S.CODE CONG. & AD. NEWS 2649 (available on Westlaw at 1996 WL 443732 at 744). Functional equivalence is a criterion in crafting the Listing of Impairments so as to ensure the proper consideration of disability in children. *Id.* The new regulations expressly direct the assessment of functional equivalence for children whose impairments do not meet or equal in severity a listed impairment. 20 C.F.R. § 416.926a.

The parties call upon the district court to decide one appeal involving one child. This Court need not decide the harder question—whether all claimants properly found not to be disabled under the old law would necessarily be found not to be disabled under the new "more stringent" law. As required by Congress, this Court now applies to this appeal the new law and regulations.

## B. Evidence Reviewed by Both the ALJ and the Appeals Council [R. 1–228]

Since his birth, Haws has had severe respiratory and developmental problems associated with muscular dystrophy. On March 5, 1993, at nine weeks old, Haws was admitted to Central Florida Regional Hospital for four days for evaluation of possible seizures. R. 119–20. Mrs. Haws noted that her son would tense and arch backward, choking after each feeding. R. 120. However, the electroencephalogram showed no abnormalities. The barium swallow indicated that Haws suffered from mild chalasia.[8]

On April 4, 1993 Mrs. Haws took her son to the emergency room because he was coughing, choking and experiencing difficulty breathing. R. 128. Dr. Dennis Natale diagnosed him with acute viremia and upper respiratory infection. R. 128. X-rays of his chest revealed no abnormalities. R. 131. The following day, Haws was admitted to Florida Hospital, Orlando with a diagnosis of bronchiolitis, gastroenteritis, and to rule out apnea and heart murmur. R. 133–54. Haws stayed at the hospital for five days undergoing various tests including electrocardiogram, echocardio-

---

8. Chalasia is the inhibition and relaxation of any previously sustained contraction of mus-
cle.

gram, pH probe, esophargogram and apnea monitoring. R. 133. Haws continued to have difficulty breathing, and at one point turned blue, and was unresponsive because he was unable to breathe for approximately five minutes. R. 133. Haws also had problems with nausea, vomiting, and diarrhea. R. 133. Dr. William E. Oakley, the examining physician, noted that Haws was small for his age, appeared tired and showed signs of mild intercostal retractions. R. 134. Dr. Oakley diagnosed bronchiolitis and gastroenteritis. On discharge, Mrs. Haws was instructed to suction her son with saline before and after his meals. R. 136. Haws was sent home with Ventolin elixir and Cefzil to help reduce his congestion. R. 137. Dr. Oakley consulted with social work for a recommended follow-up for home health services for reassessment because of his concern of Haws' "possible failure to thrive." R 136.

On July 22, 1993, Mrs. Haws brought her son back to the emergency room because he had a high fever and difficulty breathing. He was also vomiting blood. R. 155. Dr. Natale examined Haws, and diagnosed him with an acute upper respiratory infection. R. 156. Dr. Natale treated Haws with Rocephin, and advised Mrs. Haws to follow up with a private physician the following day. R. 156. Four days later, on July 26, 1993, Mrs. Haws returned to the emergency room with her son because of his increased wheezing. R. 166. X-rays appeared normal. Dr. Natale diagnosed Haws with bronchospasm and upper respiratory infection. Dr. Natale discharged Haws the same day, however, he advised Mrs. Haws that she should return at any time should his condition worsen. R. 167.

On December 23, 1993, Mrs. Haws again took her son to the emergency room. R. 175. Haws was diagnosed with bronchitis and treated with Robitassin, Amoxicillin, and Albuteral. The attending physician, Dr. Harvey Schefsky noted that Haws' throat was filled with mucus. Dr. Schefsky also detected scattered coarse rales and wheezes in Haws' chest. R. 175. On April 9, 1994, Haws was hospitalized due to gastroenteritis and dehydration. R. 179–85.

The record also contains Haws' pediatric notes from his numerous visits to his family doctors. On April 29, 1993, Dr. John Terwilleger examined Haws. Dr. Terwilleger detected tales and wheezing in Haws' chest, and diagnosed bronchiolitis. R. 194. Dr. Terwilleger also noted that Haws was below the fifth percentile on the growth and height curve. R. 194. Dr. Terwilleger continued Haws on Ventolin, and additionally prescribed Sudafed Elixir. R. 194. On May 13, 1993, Haws went for a recheck. R. 192. He still had a persistent cough, but his wheezing had improved. Dr. Terwilleger again noted his concern over Haws' poor growth and failure to thrive. R. 192. Dr. Terwilleger suspected that malabsorption could be causing Haws' slow growth.

Dr. Vann Parker examined Haws on June 8, 1993. R. 192–93. Dr. Parker noted moderate wheezing with frequent cough. Dr. Parker administered inhalation therapy of Albuteral which had a positive effect on his condition. R. 192–93. Haws returned to Dr. Parker on June 14, 1993 with a cough, upper respiratory congestion, and wheezing. R. 191. On June 23, 1993, Haws had a fever of 103. Haws' babysitter brought him to the doctor when he started choking. R. 191. She suctioned him out, and he appeared normal for a while. Dr. Parker noted that Haws frequently grunted when he breathed with mild flaring during his grunting episodes. R. 191. Dr. Parker diagnosed him with acute viral illness with mild aspiration. R. 191. Dr. Parker prescribed Rocephin and Acetaminopen and advised that he return in the morning. R. 190. Haws returned the following day. His fever had dropped, although, his examination indicated Haws still had a few coarse rhonchi in his upper airway. R. 190.

The following day, Haws again returned to see Dr. Terwilleger. This time he was diagnosed with pneumonia. Dr. Terwilleg-

er noted the presence of rhonchi bilaterally and a congested nose. R. 190. On July 2, 1993, Haws saw Dr. Terwilleger for a recheck. R. 190. Dr. Terwilleger noted that Haws' pneumonia had resolved. Dr. Terwilleger advised Mrs. Haws to bring him back in one month so he could monitor her son's weight. R. 130.

On July 26, 1993, Mrs. Haws took her son to his family doctor, Dr. Parker. Dr. Parker noted that Haws' chest was loaded with rhonchi. Dr. Parker gave him samples of Polyhistine–DM and Triaminic–DM. On August 13, 1993, Haws returned to his family doctor with a runny nose, cough, congestion and wheezing. Dr. Terwilleger diagnosed Haws with a viral upper respiratory infection. R. 189. On August 27, 1993, Haws went to see Dr. Terwilleger because of a worsening cough and congestion. Dr. Terwilleger advised that Haws was suffering from an upper respiratory infection and left otitis media.[9] Dr. Terwilleger treated Haws symptomatically. R. 188–89. On September 15, 1993, Haws saw Dr. Terwilleger for an ear re-check. At that time his ear infection had resolved, however, he still remained symptomatic with upper respiratory symptoms. R. 188.

On October 3, 1993, Haws saw Dr. Parker due to a cough and wheezing. R. 188. Dr. Parker again added Albuteral to Haws' medication regime. On February 12, 1994, Mrs. Haws brought her son back to see Dr. Parker because of his cough, nasal congestion, and wheezing. R. 188. Dr. Parker continued Haws on Albuteral, and prescribed Polyhistine–DM and Prelone. R. 188. On March 8, 1994, Haws returned to Dr. Parker complaining of wheezing and coughing. On March 11, 1994, Haws saw Dr. Parker for a re-check. Dr. Parker noted Haws' wheezing had improved, but he still had a congested nose, cough, left otitis media, and upper respiratory infection. R. 187. On March 22, 1993, Haws'

condition had improved to the point he could receive his immunizations. R. 187.

On April 8, 1994, Haws saw Dr. Terwilleger due to gastroenteritis. He was about four percent dehydrated by weight, and Dr. Terwilleger considered admission to the hospital for I.V. fluids. R. 187. Dr. Terwilleger admitted Haws the following day after observing that Haws had lost one half pound from the previous day, and after observing an increase to seven percent in his dehydration. R. 186. After his discharge from the hospital, Haws went to Dr. Terwilleger for a re-check. The gastroenteritis had resolved but he had spiked a fever of 102. R. 186. Dr. Terwilleger again diagnosed Haws with an upper respiratory infection and left otitis media. R. 186.

On May 4, 1994, Haws returned for a re-check. His conditioned had improved, and Haws started to show some good weight gain. R. 186. On July 12, 1994 Mrs. Haws brought her son to see Dr. Parker because of an elevated fever and cough. Mrs. Haws advised Dr. Parker that her son could not eat anything more solid than baby foods. R. 228. Her attempts to feed him junior foods caused gagging. R. 228. Dr. Parker diagnosed Haws with an upper respiratory infection, and advised his mother to try to start him on chopped food after he healed from his illness. R. 228. Haws' infection took a turn for the worse, and he returned to Central Florida Hospital because of a high fever on July 18, 1994. R. 195–97. Haws was diagnosed with acute pharyngitis.[10] He was treated with Bicillin and Tylenol, and was advised to follow-up with Dr. Parker. R. 196.

As advised, on July 20, 1994, Haws followed-up with Dr. Parker. R. 228. Dr. Parker continued to symptomatically treat Haw's condition, and he administered Haws' immunizations. R. 228. On October 4, 1994, Haws returned to the hospital due to an elevated fever, difficulty with

9. Otitis media is a middle ear infection.

10. Pharyngitis is the inflamation of the mucous membrane and underlying parts of the pharynx.

breathing, and vomiting. R. 198–200. Haws was diagnosed with acute left otitis media and upper respiratory infection. R. 199. Dr. Linda G. King examined Haws, and noted that both of his ear canals were completely occluded with cerumen. R. 200. She administered an injection of Rocephin and Pedia–Profen. Haws was discharged two days later with instructions to return should his condition worsen. R. 201. Dr. King noted that Haws had a history of asthma.[11] R. 201. On October 8, 1994, Haws followed up with Dr. Terwilleger. Dr. Terwilleger detected wheezing, but opined that it was more likely bronchiolitis than asthma.

On October 9, 1994, Haws returned to the hospital because of a diagnosis of clinical pneumonia. R. 204–08. He failed to improve from the treatment in the emergency room, was admitted, and placed in a crib tent. On admission examinations, tympanic membranes were retracted. R. 205. Haws had a significant amount of clear discharge from his nose. His chest examination showed diffuse fine rales and rhonchi with mild to moderate intercostal retractions. His discharge diagnosis (four days later) was bronchiolitis secondary to respiratory syncytial virus. R. 205. On October 22, 1994, Haws saw Dr. Parker for a re-check. The examination showed that Haws' chest was full of coarse rhonchi with a markedly stopped up nose. R. 227. Dr. Parker discussed with Mrs. Haws the possibility of Haws suffering from cystic fibrosis. R. 227.

On December 2, 1994, Dr. Guedes at the Children's Medical Services pediatric clinic saw Haws for complaints of asthma. R. 46. Dr. Guedes diagnosed him with chronic respiratory disorder. R. 46. Dr. Guedes noted that Haws was a mouth breather and suffered from developmental delay.

R. 46. Dr. Guedes indicated that Haws suffered from many problems, and referred him to Arnold Palmer Hospital for a complete evaluation. R. 46. Dr. Guedes noted that Haws was only two years old, but had been admitted to hospitals six times for pneumonia.

On December 16, 1994, Haws was diagnosed with adenoid hypertrophy with airway obstruction, and he underwent an adenoidectomy and examination of his ears under anaesthesia to rule out otitis media at Orlando Regional Care. R. 209–10. Dr. Stephen Early did the procedure. R. 209–10. On February 28, 1995, Dr. Early reported that Haws' obstruction and snoring had largely disappeared. R. 211. He stated that Haws still had sinusitis, but that he was treating that condition with Septra and Sudafed Liquid. R. 211–12

On January 6, 1995, Haws again saw Dr. Guedes because of continued difficulty with developmental problems. R. 45. Dr. Guedes noted that Haws experienced difficulty with swallowing. R. 45. Dr. Guedes diagnosed oropharyngeal dysmotility.[12] R. 45. Dr. Guedes opined that Haws' asthma and coughing was related to the swallowing dysmotility. Dr. Guedes stated that Haws needed a developmental evaluation and treatment. Dr. Guedes referred Haws to the Developmental Clinic.[13] R. 45.

On February 3, 1995, Dr. Guedes examined Haws for an assessment of Haws' functional limitations. R. 214–18. Dr. Guedes noted marked limitations in the following areas: cognitive/communicative; social; cognitive development/function; communicative development/function; social development/function; personal/behavioral development/function; and concentration, persistence and pace. R. 214–18. Dr. Guedes further noted that Haws was

---

**11.** This is the first indication that Haws' respiratory problems may have stemmed in part from asthma. His medical records are not clear as to the asthma onset date.

**12.** Oropharyngeal dysmotility is an impairment of the portion of the pharynx that lies posterior to the mouth that is continuous

above with the nasopharynx via the pharyngeal isthmus and below with the laryngopharynx.

**13.** Although Mrs. Haws testified that her son goes to the developmental clinic and the physicians refer to his attendance there, the records were not available for review.

moderately limited in his motor development function area. R. 216. Additionally, Dr. Guedes indicated that Haws suffered from decreased ability to swallow and from growth delay. Dr. Guedes observed that Haws did not speak and had no communicative skills either receptive or outgoing. At the time of Dr. Guedes exam, Haws was twenty-six months old. Dr. Guedes opined that Haws had the cognitive skills of a child less than one year old. R. 218.

The ALJ discounted Dr. Guedes' findings because he could identify no clinical findings or diagnostic testing to support Dr. Guedes' conclusions of marked limitations. R. 23. However, Dr. Guedes' conclusions were based on his own clinical examination and observation of William Haws' limitations. Case law does not require that the treating physician's clinical findings be supported by clinical documentation.[14] Dr. Guedes was a treating physician, and his opinion carries great weight, particularly in light of an absence of contradictory evidence. Dr. Guedes had the benefit of having examined Haws, and was able to review his medical records to assist him in his assessment. The record as a whole supports Dr. Guedes' evaluation. The Commissioner erred in disregarding Dr. Guedes' assessment of Haws.

On April 7, 1995, Haws again saw Dr. Guedes for problems with his developmental delay, and for a cold. R. 213. Dr. Guedes noted a diagnosis of asthma and the presence of saliva in his posterior oropharynx. At the visit, Mrs. Haws advised Dr. Guedes that her son was receiving treatment in the Developmental Clinic. Dr. Guedes recommended that she continue her usual course of care. R. 213. On May 10, 1995, Haws went to Dr. Terwilleger for his two year well visit.[15] Dr. Terwilleger noted that Haws had developmental delay, respiratory problems, difficulty in swallowing and regurgitating food. Dr. Terwilleger also noted that Haws was in

speech therapy, and he advised Mrs. Haws to continue with the therapy. He also recommended occupational and physical therapy. R. 227.

On December 18, 1995, Dr. Lynda C. Pollack, a neurologist, referred Haws to the Arnold Palmer Hospital for Children and Women for an oral pharyngeal motility study. R. 219–21. Dr. Pollack advised that the presenting concern was "coughing, wet and gurgly voice, and heavy secretions during feeding." Haws' history indicated failure to thrive, developmental delay, hypoglycemia, asthma, and chronic respiratory disorder. R. 219–21. Although Haws was three years old at the time of the study, he was still only eating pureed baby foods and liquids. R. 219. During the study, Haws was observed as flat in affect and delayed in his motoric and cognitive responses. R. 219.

The pharyngeal motility study indicated that Haws has a low oral-facial tone with habitual open mouth, and tongue protruded past his teeth. R. 219. Haws was observed to have decreased lip activity, delayed and weak movement of tongue for lateralization, elevation, and retraction with elicitation. Haws compensated with increased jaw movement. However, Haws had poor jaw stability and weak power to a bite soft cookie. His chewing was weak and insufficient. Gagging, drooling, and coughing were all present and observed spontaneously. Mrs. Haws attended the study, and fed her son liquid, thickened barium, and a soft cookie coated with barium. R. 219. Haws demonstrated weak and uncoordinated oral preparatory skills to form and transition the bolus. R. 220. The bolus was noted to spill over posterior aspect of Haws' tongue prematurely for all consistencies. A residual bolus coated his tongue after he swallowed. R. 220. At the pharyngeal stage, a delayed initiation of swallow of one to three seconds was

---

14. *See Allegra v. Bowen,* 670 F.Supp. 465, 468 (E.D.N.Y.1987) (citing *Bluvband v. Heckler,* 730 F.2d 886 (2d Cir.1984).

15. Due to Haws' continuous illnesses, he was not able to receive his two year old immunizations until he was approximately two and half years old.

observed with all consistencies. The bolus was noted to spill and pool in the valleculae and to the level of the pyriform sinuses during these delays. R. 220. The residual bolus accumulated in the pyriform sinuses and spilled into the laryngeal vestibule and into the airway with the swallow.

Uncoordinated epiglottal movement appeared to contribute to poor airway protection. Significant and frequent laryngeal penetrations and subglottic aspirations were observed with each consistency. Also weak and delayed oral-pharyngeal musculature appeared to contribute to Haws' severe dysphasia.[16] R. 220. In conclusion, the report noted that alternative non-oral means of nutrition should be considered. R. 221. It also recommended that Mrs. Haws thicken all liquids, make Haws swallow three times per swallow followed by a cough and an additional swallow, use a cup only to slow the rate of liquid intake, and use the chin tuck while swallowing to aid in bolus clearing until further medical management of dysphasia could be obtained. R. 221. The report recommended that Haws continue with oral, motor, and rehabilitative therapies. R. 221.

On December 20, 1995, Haws went to the GI Clinic at the Children's Medical Services on an urgent referral because of his abnormal oropharyngeal motor study ["OPMS"]. His OPMS demonstrated profound weakness of pharyngeal phase with direct aspiration of the pharyngeal contents into the trachea. R. 41. Dr. Milov examined Haws, and observed marked obvious facial weakness, drooling, and pooling of oropharyngeal secretions. The pulmonary examination revealed coarse rhonchi to be present throughout his lungs. R. 41. Dr. Milov stated that Haws had phenotypic evidence and a history that would support a diagnosis of **myotonic dystrophy.**[17] He discussed with Haws' parents alternative methods of feeding. R. 41–42.

On December 26, 1995, Haws went for his first visit to the pulmonary clinic at the Children's Medical Services for an evaluation of a possible chronic lung disease. R. 39. The examining physician, Dr. Livingston noted several admissions to various hospitals in the past secondary to pneumonia that appeared to be aspiration related. Dr. Livingston reported that Haws had difficulty with phonation, and was currently in speech therapy twice a week.[18] R. 39. Dr. Livingston recommended x-rays to rule out any significant findings of bronchiectasis with chronic lung changes. Dr. Livingston also referred Haws to the Ear, Nose, and Throat Clinic for a tonsillectomy evaluation. R. 39.

On January 23, 1996, Haws went to the pulmonary clinic at the Children's Medical Services for examination. R. 37–38. Haws was referred to the clinic for studies to confirm chronic lung disease secondary to recurrent aspiration. The x-rays showed some perihilar markings but no evidence of bronchiectasis. R. 37. At the exam, Dr. Livingston, a pulmonary specialist, noted that Haws was suffering from respiratory congestion. His mother advised Dr. Livingston that Haws snored at night with significant upper airway symptomatology. At the time of the visit, Haws was three years old and was still only able to consume liquid foods. R. 37–38. The oropharyngeal study indicated significant penetration past Haws' vocal cords during oral feedings. R. 37. The exam revealed an obvious atopic obstructive apnea facies with an open mouth and protruding

---

**16.** Dysphasia is the impairment in the production of speech.

**17.** Myotonic dystrophy is the most common muscular dystrophy, characterized by progressive muscle weakness and wasting of some of the cranial innervated muscles, as well as the distal limb muscle.

**18.** Although the record contains notations from Haws' treating physicians observing Haws' slow speech development, the record does not contain reports from his speech therapy.

tongue. The examining physician noted 2+ nasal turbinates with stridorous breathing over Haws' lateral neck. R. 37. The diagnosis was tonsillar hypertrophy leading to oropharyngeal dysmotility and possible recurrent aspiration. It was recommended that Haws obtain a lateral neck x-ray to assess his upper airway and to prove some tonsillar hypertrophy leading to upper airway obstruction. R. 37.

On January 23, 1996, Haws also saw Dr. DeSai, a neurologist, for the first time at the neurology clinic at the Children's Medical Services. R. 35. Dr. Milov had referred Haws to Dr. DeSai to rule out a neurological disorder. R. 35. Dr. DeSai noted that Haws had a history of asthma, developmental delay, **myotonic dystrophy,** chronic recurrent aspiration with pneumonia, and failure to thrive. R. 35–38. Dr. DeSai's impressions were Gower's sign, diffuse hyptonia, depressed deep tendon reflexes, diffusely decreased muscle mass, and diffuse weakness which was more proximal than distal. R. 36. He opined that Haws likely had a neuromuscular disorder, and recommended a CPK study, an EMG, and a muscle biopsy. R. 36.

On January 24, 1996, Dr. Milov examined Haws at the GI clinic after his pulmonary consultation was completed. R. 34. Dr. Milov indicated he would be reviewing Haws' condition with Dr. Livingston for further recommendations. R. 34. On February 6, 1996, Haws returned to the neurology clinic at Children's Medical Services. R. 33. Dr. DeSai examined Haws and found his condition consistent with diffuse neuromuscular weakness, greater proximally than distally. Dr. DeSai noted that Haws had a lordotic posture, a mildly waddling gait, and a positive Gower's sign. R. 33. Dr. DeSai again recommended an EMG, followed by a muscle biopsy, and an evaluation by Dr. Pollack for a second opinion regarding Haws' neurological problems. R. 33.

On February 13, 1996, Haws went to the pulmonary clinic for an evaluation by Dr. Livingston. Dr. Livingston's diagnosis included asthma, developmental delay, and **myotonic dystrophy.** R. 32. Dr. Livingston recommended a bronchoscopy with a bronchial lavage to prove that Haws was having significant aspiration pneumonia, and to further rule out lipid laden aspiration macrophages. On February 22, 1998, Haws returned to Dr. Pollack because of his chronic weakness, a CPK of over 1000,[19] a large tongue, an abnormal waddling gait and a Gower's sign. R. 30–31. Dr. Pollack noted that Haws did not walk until he was eighteen months, and his language development was delayed. Dr. Pollack observed that Haws' mouth was perpetually open, and his tongue appeared large. His oropharynx was narrow and palate was rather high arched. The doctor further noted that Haws' tonsils were large and met in the midline. R. 30. Dr. Pollack diagnosed asthma, developmental delay, and **myotonic dystrophy.** R. 30–31. Dr. Pollack indicated that Haws' symptoms were consistent with **Duchenne muscular dystrophy** and obstructive sleep apnea. R. 31.

On January 22, 1996, the ALJ held a hearing on Haws' claim. R. 59–67. At the time of his decision on April 19, 1996, R. 27, the ALJ had Haws' medical records through April 5, 1996. R. 1–2, 28–56.

### C. District Court Must Review Appeals Council Evidence

■ After the ALJ's April 19, 1996 decision—but before the appeal was decided—Haws submitted additional medical records covering from March 19, 1996 through June 10, 1997 to prove his treatment and diagnoses during that period. R. 4, 7. The Appeals Council properly made them a part of the record, R. 7, and also considered them in denying review.

**19.** CPK study is a test of enzymes catalyzing the reversible transfer of phosphate from phosphocreatine to ADP, forming creatine and ATP; of importance in muscle contraction. Certain isozymes are elevated in plasma following myocardial infarctions. The normal range is 29–190. R. 33.

R. 5. The Commissioner now argues that the district court may not consider the new evidence [R. 229–63] in determining whether the Commissioner erred in denying review of the ALJ's decision. Docket No. 16 at 13. The Commissioner is mistaken.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g). It makes no legal sense for the Commissioner to argue that an Appeals Council's denial of a request to review is not a "final determination" on the merits within the meaning of § 405(g). *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983). The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence. R. 5; 20 C.F.R. § 416.1470; *Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir.1986) (en banc). The Appeals Council's decision is subject to judicial review to determine if it is supported by substantial evidence. *Parker v. Bowen*, 788 F.2d at 1517, 1519–20 (Appeals Council had reversed ALJ on its own motion and had not denied review). When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. § § 404.970(b); 416.1470(b); *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir.1994). Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review. *Keeton*, 21 F.3d at 1066. Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ—and to ignore the new evidence presented to the Appeals Council as the Commissioner

urges us to do here—in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Commissioner does not dispute that the Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir.1998). Indeed, the Appeals Council considered and evaluated the new evidence in this case. R. 5. The Commissioner accurately cites *Falge* for the rule that, when the Appeals Council has denied review, the district court will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Secretary of Dept. of Health and Human Services*, 983 F.2d 815, 817 (7th Cir.1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him).

But the Commissioner ignores an important difference between *Falge* and Haws— a difference stressed by the United States Court of Appeals for the Eleventh Circuit. In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review. Instead he appealed only the ALJ's decision to deny benefits. 150 F.3d at 1324. In this case, however, Haws does expressly appeal and seek a reversal of the Appeals Council's decision to deny review.[20] Docket No. 1 at 1–2 (complaint); Docket No. 13 at 2 (appeal memorandum). Contrary to the position urged by the Commissioner, the Eleventh Circuit directs the district courts to consider evidence submitted only to the Appeals Council in reviewing the Appeals Council's denial of review. *Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066.

---

**20.** On September 18, 1997, Haws filed a complaint in the United States District Court for the Middle District of Florida seeking judicial review of "the decision of the Appeals Council of the Social Security Administration." Docket No. 1 at 1–2. Mrs. Haws filed her appeal brief on November 25, 1998 arguing that the Appeals Council had failed to recognize that the ALJ had abused his discretion, and that the ALJ had proffered a decision not supported by substantial evidence. Docket No. 13 at 2. Haws asked this Court to review, reverse, and set aside the Appeals Council's decision, and to grant Haws' claim. Docket No. 1 at 2.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision—the last step of review necessary to exhaust administrative remedies. When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error. *Keeton*, 21 F.3d at 1066. Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error. *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record). The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, Haws has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies. The Appeals Council has considered Haws' additional evidence in light of the issues raised in the request for review, has considered the newly-applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discre-

tion, and determining that the ALJ's findings are supported by substantial evidence. The Appeals Council's determination is subject to judicial review. The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review." *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g)).

### D. Evidence Reviewed by the Appeals Council [R. 229–63]

Following the direction of the court of appeals, this Court now considers the new evidence previously evaluated by the Appeals Council in order to determine whether reversal or remand is required. On March 19, 1996, Haws saw Dr. Early due to continuing symptoms of sleep apnea. Dr. Early recommended a sleep study. R. 234. On March 20, 1996, Dr. Milov examined Haws and reviewed his earlier diagnosis of developmental delay, dysphagia [21] probable tracheal aspiration of pharyngeal phase, intermittent reactive airway disease, and myopathy,[22] possible myotonic dystrophy. R. 250. Dr. Milov noted that Haws had again suffered from a case of pneumonia. Dr. Milov discussed with Mrs. Haws the fact that her son may need an alternative method of feeding such as percutaneous endoscopic gastrostomy.[23] R. 250.

On April 8, 1996, Haws was seen at the pediatric clinic at the Children's Medical Services by Dr. Ramirez for his three year old annual visit. R. 249. Dr. Ramirez noted that Haws could not run, and walked with a waddling gait. At the visit, Haws'

---

**21.** Dysphagia is an impairment which causes difficulty in swallowing.

**22.** Myopathy is any abnormal condition or disease of the muscular tissues; commonly designates a disorder of the muscular tissues.

**23.** Percutaneous endoscopic gastrostomy is feeding by intravenous tubing.

father advised that when Haws attempted to run, he would fall on his head. R. 249. He was too slow to put out his hands to catch the fall.[24] R. 249. Dr. Ramirez discussed with Mr. Haws, Dr. Pollack's diagnosis of suspected **Duchenne muscular dystrophy**. R. 249. Dr. Ramirez advised Mr. Haws to bring Haws back for a further check-up in six months. R. 249. On the same day, Haws saw another pediatric doctor, Dr. Baston for a croupy cough and chest congestion. R. 258. Dr. Baston confirmed the presence of rhonchi in Haws' chest. R. 258. On April 10, 1996, Dr. Early saw Haws after Haws completed a sleep study. R. 233. Dr. Early noted continuing chest congestion and placed him on Augmentin. R. 233. Dr. Early discussed the possibility of a muscle biopsy to confirm the diagnosis of muscular dystrophy. On April 18, 1996, Haws saw Dr. Pollack at the neurology clinic at the Children's Medical Services. R. 248. Dr. Pollack reported that she believed that Haws had **Duchenne muscular dystrophy** based on his proximal weakness, globally delayed development, myopathic features with large tongue, and a CPK determination that was above 1000. Dr. Pollack noted that Haws was at risk for malignant hyperthermia. R. 249.

On May 14, 1996,[25] Haws went to the Children's Medical Services pulmonary clinic for a follow-up visit with Dr. Livingston. R. 247. Dr. Livingston advised that the fiber optic bronchoscopy he performed on Haws showed laryngotracheomalacia. R. 247. On examination, Dr. Livingston reported that Haws was dull-appearing. Haws had boggy purplish nasal mucosa, swollen turbinates and thick clear to green purplish nasal mucosa, swollen turbinates and thick clear to green rhinorrhea. Dr.

Livingston treated Haws with Dallergy Syrup to clear up the congestion so Haws could undergo the planned surgery to remove his tonsils and conduct a muscle biopsy. R. 247.

On July 2, 1996, Dr. Batson saw Haws for an unresolved cough. R. 257. Dr. Batson diagnosed rhinitis, sinusitis, bronchitis, and pharynigitis. R. 257. Haws' chest examination indicated the presence of rhonchi. R. 257. On July 18, 1996, Dr. Pollack again advised that she believed Haws suffered from a suspected Duchenne dystrophy. Haws had a DNA deletion test, but the result was negative. Dr. Pollack recommended a muscle biopsy to confirm her diagnosis. R. 246. Dr. Pollack also advised Haws to return after his tonsilloadenoidectomy and muscle biopsy. R. 246.

On August 13, 1996, Haws returned to see Dr. Livingston at the pulmonary clinic at the Children's Medical Services. R. 245. Dr. Livingston noted that Haws' DNA deletion test was within normal limits, and suggested Haws undergo a muscle biopsy at the time he was scheduled for an adenoidectomy. R. 245. The HEENT exam showed some stertorous breathing over the lateral neck. The lung exam indicated a few transmitted upper airway sounds but good air exchange bilaterally. R. 245. It was Dr. Livingston's impression that Haws was a "3 ½ year old male with a myotnic dystrophy that is undiagnosed at this point in time with a long history of upper airway obstruction and recurrent aspiration secondary to adenoidal hypertrophy."[26] He recommended a definitive otolaryngology surgery with a muscle biopsy, and advised Haws to return in four months for a recheck. R. 245. On

---

**24.** Mrs. Haws testified at the hearing that her son could not run or climb. R. 63. She also testified that Haws was always off balance most of the time and would fall on his head because he did not know how to reach out to break the fall. R. 62–63.

**25.** The following medical evidence pertains to events after April 19, 1996, the date of the ALJ's decision. R. 27; 20 C.F.R.

§§ 404.970(b), 416.1470(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted to it if it relates to the period on or before the date of the ALJ hearing decision); *accord, Keeton v. Department of Health and Human Services,* 21 F.3d 1064, 1066 (11th Cir.1994).

**26.** Adenoidal hypertrophy is an abnormal increase in the size of the adenoids.

September 30, 1996, Haws saw Dr. Batson for a two-week old unresolved cold. The records from this visit are barely legible. R. 256.

On October 24, 1996, Haws went to the neurology clinic at Children's Medical Services to see Dr. Pollack. R. 244. Dr. Pollack noted that Haws had some atypical features including facial weakness and ptosis. She recommended that at the time Haws underwent his tonsilloadenoidectomy, he should undergo a muscle biopsy to confirm her Duchenne muscular dystrophy diagnosis. R. 244. On October 29, 1996, Dr. Early saw Haws and discussed Dr. Pollock's diagnosis of Duchenne muscular dystrophy. Dr. Early observed that Haws had proximal weakness, global delay, and myopathy. Dr. Early discussed the possibility of a tonsillectomy for Haws' chronic airway obstruction and apnea at night. R. 232. His exam showed a flat-featured child who seemed bright but had ptosis and very little facial movement. Dr. Early also stated that Haws had glossoptosis.[27] Dr. Early stated that Haws had difficulty with swallowing in that Haws had very poor pharyngeal contraction, and he believed that Haws was at risk for aspiration. R. 232.

On November 15, 1996, Dr. Batson examined Haws who presented with complaints of a fever, cough, and vomiting. R. 254. Dr. Batson noted Haws appeared fatigued with swollen nodes. He diagnosed rhinitis and sinusitis. R. 254. Haws' chest exam indicated the presence of rhonchi. R. 254. On December 10, 1996, Haws saw Dr. Livingston at the Children's Medical Services' pulmonary clinic. R. 243. At the time of the exam, Haws demonstrated no signs of respiratory distress. However, Dr. Livingston noted an occasional cough and upper airway congestion. He prescribed Nasacort AQ nasal spray, and a follow-up exam in four months. R. 243.

The Commissioner found that Haws suffered from a history of respiratory difficulties. R. 24. However, the Commissioner also found that the adenoidectomy significantly improved his nasal pharyngeal obstruction condition. R. 24. The evidence contradicts this findings. As discussed above Haws continued to have symptoms of obstruction during the day and while sleeping at night after the adenoidectomy. Moreover, at the hearing, Mrs. Haws testified that at night Haws breathes very hard, he gags, and coughs. R. 65. She further testified that Haws never sleeps through the night, and she has to get up about nine times each night to flip him on his stomach to keep him from choking. R. 65. Haws' respiratory difficulties did not improve after the adenoidectomy.

Because Haws symptoms of obstruction continued, Dr. Early again opined that a tonsillectimony and muscle biopsy should be performed. R. 231. On January 13, 1997, Haws saw Dr. Early for a preoperative visit. R. 230. Dr. Early performed the procedure on January 15, 1997. R. 231. Dr. Early examined Haws on January 23, 1997, on a return visit because Haws had an episode with coughing up old blood. Dr. Early advised Haws' father that he should continue with routine feedings and care. R. 230. On the same day, Haws was taken to the emergency room because of coughing up blood. R. 260. He was diagnosed with pneumonitis and post surgery bleeding with cough. R. 260–63. On January 23, 1997, x-rays confirmed that Haws was indeed suffering from pneumonia. R. 263.

On February 6, 1997, Haws returned to the neurology clinic. Dr. Pollack noted that Haws' muscle biopsy established the diagnosis of congenital fiber type disproportion. He stated that "this is a congenital myopathy with variable prognosis." R. 242. Dr. Pollack advised that some similar patients are profoundly weak and have associated cardiomyopathy, and in others, only mild weakness is present. She examined Haws, and observed severe facial weakness. R. 242. She also noted mild ptosis, an opened mouth and protruding

---

27. Glossoptosis is a downward displacement of the tongue.

tongue. In addition, she observed a weakness of the proximal limb musculature. Dr. Pollack characterized Haws' gait as a prominent lumbar lordosis and waddle. She observed that Haws did not clear both feet from the ground simultaneously when attempting to run. Haws was only able to arise from the floor by pulling up on a nearby object. R. 242. Dr. Pollack recommended a polysomnogram be repeated at Florida Hospital South. Dr. Pollack also referred Haws to the cardiac clinic for a baseline evaluation. R. 242.

On February 17, 1997, Haws saw his family physician Dr. Batson complaining of a cold, diarrhea, vomiting, and stomach pain. R. 253. Dr. Batson diagnosed him with gastroenginitis and dehydration. R. 253. On March 3, 1997, Haws saw his family physician, Dr. Batson for severe cold, ear infection, and upper respiratory congestion. R.1997. On March 6, 1997, Dr. Early reported that Haws' biopsy confirmed Haws as having myasthenia.[28] R. 230. Dr. Early indicated that Haws' airway was doing very well with no obstruction, although Haws still had problems with ear infections and chronic respiratory congestion. Dr. Early also noted that Haws had difficulty when he drank liquids, but he concluded, that would be expected with a child with pharyngeal weakness and dysmotility based on hypotenicity. Dr. Early recommended the use of Thicket to help with liquids to minimize aspiration. R. 230.

On March 19, 1997, Haws went to the Children's Medical Services cardiac clinic to see Dr. Appleton. Dr. Appleton observed that Haws was a very small child with loose musculature particularly in the facial features. R. 241. The HEENT was remarkable for a "difficulty with ptosis and kind of an open mouth breathing appearance." R. 241. The cardiovascular exam revealed an I/VI vibratory short systolic ejection murmur heard best at the fourth left intercostal space. Haws' EKG was

normal for his age with no evidence of hypertrophy or other abnormalities. R. 241. His chest x-ray was also normal. Dr. Appleton recommended that Haws return in a year to undergo an echocardiogram because of his concern that a ventricular dysfunction and cardiomyopath[29] might develop. R. 241.

On March 25, 1997, Haws saw Dr. Charles Batson at the Children's Medical Services pulmonary clinic. R. 237. Dr. Batson noted that Haws' biopsy was positive for fibromuscular disproportion. He expressed concern that Haws was at risk for recurrent aspiration pneumonia and retention of mucus because of a poor cough from his fibromuscular disproportion. R. 237. Dr. Baston noted that the sleep study on Haws demonstrated mild obstructive hypopnea but that recently his condition had improved some because of his surgery. R. 240. On June 10, 1997, Dr. Geller saw Haws for a recheck. Dr. Pollack notes that Haws' chronic congestion had improved with Nasacort and Zithromax which changed his mucus from yellowish-green to clear. He notes that Haws was doing well except for pooling of secretions and swallowing dysfunction which he believed was due to Haws' muscular dystrophy. He switched Haws' nasal spray to Dallergy to dry up the secretions. Dr. Pollack agreed with Haws' course of care which included physical therapy. R. 239.

### E. Analysis

#### 1. *Medical Definitions*

██ Substantial evidence does not support the Commissioner's denial of William Haws' claim of disability under the legal standard in effect at the time of the Commissioner's (Appeals Council's) final decision. The Commissioner argues that "medical literature indicates that DMD rarely occurs in infancy and generally

---

**28.** Myasthenia is muscular weakness.

**29.** Cardiomyopathy is a disease of the myocardium. The myocardium is the middle layer of the heart, consisting of the cardiac muscle. Cardiomyopathy commonly develops in patients with Duchenne muscular dystrophy.

presents itself between ages two or three and seven." Docket No. 16 at 8. The Commissioner relies on the definition of Duchenne muscular dystrophy in MERCK MANUAL, 16th Ed. (1992). Docket No. 17, Ex. A. Rather than support the Commissioner's argument, however, that definition underscores Haws' argument that Duchenne muscular dystrophy is extremely disabling:

> An X-linked recessive disorder typically presenting in boys aged 3 to 7 years as proximal muscle weakness causing waddling gait, toe-walking, lordosis, frequent falls, and difficulty in standing up and climbing stairs. DD is caused by a mutation at the Xp21 locus, which results in the absence of the gene product dystrophin. This protein is normally localized to the sarcolemme of muscle cells.
>
> The pelvic girdle is affected first then the shoulder girdle. Serum enzymes, notably CK are markedly elevated (up to 50 to 100 times normal) even early in the disease or during the first year of life, before symptoms develop. **Progression is steady and most patients are confined to a wheelchair by age 10 or 12.** Cardiac involvement is common; 90% of patients show ECG abnormalities. A firm pseudophypertrophy of the calves is due to fatty and fibrous infiltration of the muscle. The average IQ in DD is 1 standard deviation below the mean. Flexion contractures and scoliosis ultimately occur, and **most patients die by age 20 yr.**

MERCK MANUAL, 16th Ed. (1992) [Docket No. 17, Ex. A] (emphasis supplied).

Duchenne muscular dystrophy is also defined and described in SCIENTIFIC AMERICAN, VOL. III, P. 11 (1997) as:

> Clumsiness of gait, lordotic posture, calf hypertrophy, joint contractures, and toe-walking are early manifestations. These are followed by progressive muscle weakness and wasting, getting up from the floor or a low chair, climbing stairs, and arm raising become difficult. Delayed gastric emptying can cause sudden episodes of vomiting and abdominal pain. **The disease is relentlessly progressive. By 12 years of age, affected children are wheelchair bound, and by 25 years of age, they die of complications of respiratory failure.** Although DMD is a disease of skeletal muscle, cardiac muscle is often affected, and congestive heart failure and arrhythmia may occur later in the disease.

SCIENTIFIC AMERICAN, Vol. III at 11 (1997) (emphasis supplied).

### 2. *Application Under Old Law*

At the time the ALJ issued his decision, the law would find Haws "disabled" if he suffered from any medically determinable physical or mental impairment of comparable severity to an impairment that would prevent an adult from working. The Commissioner argues that Haws' Duchenne muscular dystrophy had not yet been fully diagnosed and confirmed at the time the ALJ issued his decision. Docket No. 16 at 8. Nevertheless, substantial evidence in the record does not support the Commissioner's finding that Haws had no physical impairment of comparable severity, and was not disabled.

The SSI eligibility regulations provided for an individualized functional analysis. As part of the first step of the sequential evaluation, the ALJ correctly found that Haws had not performed any substantial gainful activity. R. 26, Finding No. 1. The ALJ next found that Haws

> has been diagnosed as having a history of respiratory difficulties which are chronic but respond to medical treatment. In addition, he has some developmental delays with regard to swallowing.

R. 26, Finding No. 2. The ALJ then found that Haws' "impairments, considered singly or in combination, do not meet or equal the severity of any impairment listed in Appendix 1 of Subpart P of Regulations No. 4, Part A or B, and are not functionally equivalent to any impairment listed in Appendix 1." The finding was wrong.

Before the ALJ's decision, doctors suspected that Haws had muscular dystrophy,

and perhaps Duchenne muscular dystrophy, R. 31—a diagnosis later confirmed in the records before the Appeals Council. Duchenne muscular dystrophy is a degenerative and relentlessly progressive disease that falls within Listing 110.00, Multiple Body Systems:

> This section refers to those life-threatening catastrophic congenital abnormalities and other serious hereditary, congenital, or acquired disorders that usually affect two or more body systems and are expected to: ...
>
> Produce long-term, if not life-long, significant interference with age-appropriate major daily or personal care activities as described in listings 110.06 and 110.07. (Significant interference with age-appropriate activities is considered to exist where the developmental milestone age did not exceed two-thirds of the chronological age at the time of the evaluation and such interference has last or could be expected to last at least 12 months).

Listing 110.07, Multiple Body Dysfunction provides:

> *Multiple body dysfunction* due to any confirmed hereditary, congenital, or acquired condition with one of the following:
>
> A. Persistent motor dysfunction as a result of hypotonia and/or musculoskeletal weakness, postural reaction deficit, abnormal primitive reflexes, or other neurological impairment as described in 111.00C, and with significant interference with age-appropriate major daily or personal care activities, which in an infant or young child include such activities as head control, swallowing, following, reaching, grasping, turning, sitting, crawling, walking, taking solids, feeding self.

Listing 110.00C, Neurological provides:

> C. *Motor dysfunction.* As described in 111.06, motor dysfunction may be due to any neurological disorder. It may be due to static or progressive conditions involving any area of the

nervous system and producing any type of neurological impairment. This may include weakness, spasticity, lack of coordination, ataxia, tremor, athetosis, or sensory loss. Documentation of motor dysfunction must include neurologic abnormality (e.g., spasticity, weakness), as well as a description of the child's functional impairment (i.e., what the child is unable to do because of the abnormality). Where a diagnosis has been made, evidence should be included for substantiation of the diagnosis (e.g. blood chemistries and muscle biopsy reports) wherever applicable.

Listing 110.06, Motor Dysfunction provides:

> *Motor dysfunction (due to any neurological disorder).* Persistent disorganization or deficit of motor function for age involving two extremities, which (despite prescribed therapy) interferes with age-appropriate major daily activities and results in disruption of:
>
> A. Fine and gross movements; or
>
> B. Gait and station.

Haws had the respiratory and multiple developmental delay problems that are common in patients suffering from Duchenne muscular dystrophy. Haws' respiratory problems date from birth. According to Dr. Baston, Haws remained at risk for recurrent aspiration pneumonia and retention of mucus because of a poor cough that was due to his dystrophy. R. 237. According to Mrs. Haws, her son gags, chokes, and coughs throughout the night. These ailments continue to plague Haws notwithstanding his surgeries and numerous treatments. By the age of five and a half, Haws was hospitalized eleven times. He saw his physicians thirty-two times due to respiratory problems alone. The medical records indicate that Haws suffered from asthma, obstruction apnea, chronic respiratory difficulties. Additionally, his respiratory problems were complicated by his inability to properly swallow. Haws

could not eat solid foods. Since his birth, Haws gagged and choked on liquids. This caused problems with aspiration. Although Haws received special therapy for his developmental delay in learning to swallow, his chronic respiratory condition did not improve.

In evaluating Haws' condition, the ALJ developed an IFA to determine whether his impairments were of comparable severity to an impairment which would disable an adult. R. 26; 20 C.F.R. § 416.924d (1993) (removed effective April 14, 1997). The term "comparable severity" meant that the Haws' physical or mental impairment limited his ability to function independently, appropriately, and effectively in an age-appropriate manner comparable to the functional limitations which would disable an adult. See 20 C.F.R. § 416.924(a) (1993) (superseded effective April 14, 1997). Specifically, Haws' impairment must have substantially reduced his ability to (1) grow, develop, or mature physically, mentally, or emotionally and attain developmental milestones at the appropriate age; or (2) grow, develop, or mature physically, mentally, or emotionally, and thus, to engage in age-appropriate activities of daily living in self-care, play and recreation, school and academics, vocational settings, peer relationships, or family life; or (3) acquire the skills needed to assume roles reasonably expected of adults. Id.

Dr. Guedes conducted the IFA regarding Haws' functional limitations. The Commissioner improperly discredited Dr. Guedes report on the basis that there were no clinical findings or diagnostic testing to support his conclusion. However, Dr. Guedes was one of Haws' treating physicians, a clinician who had reviewed Haws' medical records prior to completing his evaluation. Indeed, the medical evidence of record supports Dr. Guedes' findings of marked limitations.

In developing William Haws' IFA, Dr. Guedes properly evaluated the functional "domains" appropriate for young children, which included (1) cognition; (2) communication; (3) motor function; (4) social function; and (5) personal/behavioral function, as well as the area of concentration, persistence, and pace in the completion of age-appropriate tasks. See 20 C.F.R. § 416.924d(i) (1993) (removed effective April 14, 1997). The regulations at the time further provided that "comparable severity" and, therefore, disability, will be demonstrated in children ages three to sixteen if the child is functioning at the marked level in one domain or behavior and functioning at the moderate level in another domain or behavior, or if the child is functioning at the moderate level in three domains or areas. See 20 C.F.R. § 416.924e(c)(2)(i)–(ii) (1993) (removed effective April 14, 1997). As described above, Dr. Guedes noted that Haws was markedly limited in all of his functional areas with the exception of motor development. Dr. Guedes reported that Haws was moderately limited in this area. Moreover, at the time of his assessment, Haws was twenty-six months old. Dr. Guedes indicated that Haws had the cognitive skills of a child less than one year old. Additionally, all of Haws' physicians reported that he was markedly undeveloped in his physical growth.

Duchenne muscular dystrophy is a life-threatening catastrophic congenital abnormality. The reference cited by the Commissioner describes a crippling condition likely to result in death by age twenty. Duchenne muscular dystrophy progressively attacks the muscles. Since his birth, Haws has suffered from musculoskeletal weakness, abnormal primitive reflexes, and lack of coordination. Moreover, his condition significantly interferes with such activities as swallowing, reaching, grasping, talking, walking, and taking solids.

To find "comparable severity," three domains must be moderately limited or one domain must be markedly limited, and one domain moderately limited. for Haws, only one domain was moderately limited, and the remaining domains were all markedly limited. Therefore, the Commissioner's finding that no "comparable severity" existed was not supported by substantial evi-

dence under the old law. Haws' impairments are of comparable severity to those which would disable an adult.

### 3. *Application Under New Law*

Similarly, applying the legal standard in effect at the time of the Appeals Council denial, and now in effect, substantial evidence does not support the Commissioner and the Appeals Council's decision to deny review and to deny Haws' claim of disability. This Court has applied the steps now used to determine disability for children. *See* 20 C.F.R. § 416.924 (effective April 14, 1997). First, Haws is not engaged in any substantial gainful activity. Second, considering his physical and mental impairments, William Haws does have an impairment or combination of impairments that is "severe"—i.e., more than merely minor. Third, Haws has "marked and severe functional limitations" because, as discussed above, his limitations rise to "a level of severity that meets or medically or functionally equals the severity of a listing in the Listing of Impairments in appendix 1 of subpart P of part 404 (the Listing)." 20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.

The Court has considered all evidence of record concerning Haws' age, functioning, the effect of his medication, his cognitive and social functioning, and his motor and growth development in determining whether he met a listing. 20 C.F.R. § 403.03. The Court has assessed the functional limitations caused by William Haws' impairments to determine whether his functional limitations are disabling, 20 C.F.R. § 416.926a (functional equivalence for children), and the Court finds that they are disabling, and are expected to last for more than twelve months. The record establishes that William Haws is disabled under the standard of "marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C); 20 C.F.R. §§ 416.902;

---

**30.** The district court does have discretion to remand Haws' appeal under sentence six of 42 U.S.C. § 405(g) because Haws has established: 1.) that there is new, noncumulative evidence; 2.) that the evidence is material—

*see also* §§ 416.906; 416.924 through 416.926a.

### V. *CONCLUSION AND RECOMMENDATION*

On plenary review, the district court should reverse the Commissioner's decision, and enter a judgment awarding SSI benefits to Haws. Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled. *Bowen v. Heckler,* 748 F.2d 629, 631, 636–37 (11th Cir.1984). For the reasons stated above, the record contains sufficient facts for the district court to determine that William Haws' impairment has resulted in "marked and severe functional limitations" under the new law and regulations. *See* 42 U.S.C. § 1382c(a)(3)(C) (1996); 20 C.F.R. §§ 416.902, 416.906, 416.924(d), 416.926a; and § 103.03 of Part 404, Subpart P, App. 1.

The Appeals Council erred in denying review of Haws' claim. Moreover, the Appeals Council's final decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law and regulations in denying review. *See Keeton v. Department of Health and Human Services,* 21 F.3d 1064, 1066 (11th Cir.1994); *accord Cornelius v. Sullivan,* 936 F.2d 1143, 1145 (11th Cir.1991); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir.1990). The undersigned therefore recommends that the Commissioner's (the Appeals Council's) final decision denying SSI disability benefits be REVERSED.

This Court rejects the Commissioner's argument that remand is more appropriate than reversal because Haws can reapply for benefits should his muscular dystrophy become disabling in the future. Docket No. 16 at 7 n. 5 and at 9.[30] The record reflects that Haws' muscular dystrophy

---

relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.

was already disabling at the time of the Commissioner's final decision to deny review. This Court should not grant the Commissioner's request for a sentence-six remand (with retained jurisdiction) which would begin anew the review process, and which would further delay a final adjudication.

The Commissioner has had ample opportunity to correctly adjudicate Haws' claim. William Haws was born on December 29, 1992. Haws applied to the Commissioner for disability on March 28, 1994. William Haws was then fifteen months old. R. 68. The Commissioner denied Haws' application initially on June 28, 1994, and on reconsideration on November 10, 1994. R. 71–72, 75–76. After a nine-minute hearing, the ALJ denied disability on April 19, 1996. William was three years and four months old. R. 27, 61, 67. Even assuming (contrary to the record) that Haws' Duchenne muscular dystrophy first manifested itself when he was four years old as argued by the Commissioner, the Appeals Council considered the new medical evidence before denying review. Docket No. 16 at 9; R. 5. The Appeals Council chose not to remand the case to the ALJ for reconsideration in light of the new evidence and new law, and instead denied review on July 29, 1997. This was error. William Haws was then four years and seven months old. R. 5. He is now six and one half years old. His SSI claim is now ripe for final adjudication.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED this 28th day of June, 1999.**