Sherry **JEFFERSON** o/b/o R.J., a minor, Plaintiff,

v.

Jo Anne B. **BARNHART,** Commissioner of the Social Security Administration, Defendant.

No. CIV.A.H–02–4528.

United States District Court, S.D. Texas, Houston Division.

March 12, 2004.

Donald Clifton Dewberry, Attorney at Law, Houston, TX, for Sherry Jefferson for Robert Jefferson (minor), minor Robert Jefferson, Plaintiffs.

Tasha Williams Stevenson, Special Ass't U.S. Atty, Dallas, TX, for Jo Anne B Barnhart Commissioner of Social Security Administration, Defendant.

## MEMORANDUM AND RECOMMENDATION

BOTLEY, United States Magistrate Judge.

Pending before the Court are Plaintiff Sherry Jefferson's ("Jefferson"), on behalf of her minor son, R.J.,[1] and Defendant Jo Anne B. Barnhart's ("Commissioner") cross-motions for summary judgment. Jefferson appeals the determination of an Administrative Law Judge ("ALJ") that R.J. is not entitled to receive Title XVI supplemental security income ("SSI") childhood disability benefits. *See* 42 U.S.C. § 1382c(a)(3)(C). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is recommended that Jefferson's motion (Docket Entry No. 18) be granted, the Commissioner's motion (Docket Entry No. 20) be denied, the ALJ's decision denying R.J. childhood disability benefits be reversed, and the case be remanded pursuant to sentence four to the Social Security Administration ("SSA") for further proceedings.

### I. *Background*

On June 28, 1999, Jefferson, on behalf of her minor son, R.J., filed an application for SSI benefits with the SSA, claiming that R.J. has Attention Deficit Hyperactivity Disorder ("ADHD")[2] and a Learning Dis-

---

1. In order to promote electronic access to case files while also protecting personal privacy and other legitimate interest, certain personal data identifiers shall be omitted or redacted from pleadings filed with the Court. *See In the Matter of Protecting Personal Privacy in Public Case Files*, General Order No. 2003-4 (S.D. Tex. Aug. 27, 2003) (Kazen, J.). Thus, as it relates to the case at bar, only the initials of a minor child should be used; only the last four digits of an individual's social security number should be included; and, if an individual's date of birth must be included in a pleading, only the year should be used. *See id.*

2. "Attention Deficit Hyperactivity Disorder" or "ADHD" is a childhood mental disorder characterized by inattention (such a distractibility, forgetfulness, not finishing tasks, and

order.[3] (R. 169–171). According to Jefferson, R.J. has been disabled since July 1, 1996.[4] (R. 169–171).

After R.J. was denied benefits initially and on reconsideration, Jefferson requested an administrative hearing before an ALJ to review the decision. (R. 160–161). A hearing was held on August 29, 2000, in Tyler, Texas, at which time the ALJ heard testimony from Jefferson. (R. 34–65). In a decision dated September 19, 2000, the ALJ denied R.J. SSI childhood disability benefits. (R. 13–19). In his decision, the ALJ found that R.J. had ADHD and a Learning Disorder,[5] which were severe within the meaning of 20 C.F.R. § 416.924(c). (R. 18). The ALJ determined, however, that R.J.'s impairments did not meet or medically equal one of the listed impairments in Part B of Appendix I to Subpart P, 20 C.F.R. Part 404. (R. 18). The ALJ concluded that in the cognition/communication area of development, R.J. had "marked" limitation of functioning; R.J., however, did not have "marked"

or "extreme" limitations in any other areas of functioning. (R. 19). The ALJ considered subjective complaints, presented by Jefferson, credible only to the extent they were supported by the evidence of record. (R. 19).

On October 6, 2000, Jefferson appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 375). The Appeals Council, on September 24, 2002, declined to review the ALJ's determination. (R. 6–8). This rendered the ALJ's opinion the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Jefferson filed the instant action on November 25, 2002, contesting the Commissioner's denial of R.J.'s claim for benefits.

## II. Analysis

### A. Statutory Bases for Determining SSI Childhood Disability Benefits [6]

To qualify for SSI, a child must be dis-

---

not appearing to listen), by hyperactivity and impulsivity (such as fidgeting and squirming, difficulty in remaining seated, excessive running or climbing, feelings of restlessness, difficulty awaiting one's turn, interrupting others, and excessive talking) or by both types of behavior. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 528 (29th ed.2000).

3. "Learning Disorder" refers to a group of disorders characterized by academic functioning that is substantially below the level expected on the basis of the patient's age, intelligence, and education, interfering with academic achievement or other functioning. Included are reading disorder, mathematics disorder, and disorder of written expression. See DORLAND'S, supra, at 530.

4. Jefferson, on behalf of R.J., had previously applied for SSI benefits on June 13, 1995, alleging R.J. suffered from ADHD and a Learning Disorder, and R.J. had been disabled since his birth in 1987. (R. 24, 66). After R.J.'s claim was denied initially and on reconsideration, a hearing before an ALJ was

conducted on September 18, 1997. (R. 24). Jefferson elected to proceed with the hearing pro se. (R. 24, 144). The ALJ heard testimony from Jefferson and a medical expert. (R. 24). In a decision dated October 28, 1997, the ALJ denied R.J. benefits. (R. 24–32). The ALJ determined that R.J. did not have "marked" or "extreme" limitations in any area of functioning. (R. 30). Jefferson does not appear to have appealed this decision.

5. The ALJ concluded without explanation that R.J. suffered from a Learning Disorder. (R. 14, 18). R.J.'s school records dated March 2, 1999, reveal, however, that testing did not indicate a learning disability. (R. 209).

6. In 1972, Congress overhauled the Social Security Act, producing the SSI program—an ambitious network of transfer payments to needy individuals who, for various reasons, were unable to work. See Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 80 (2d Cir. 2003) (citing Pub L. No. 92–603, § 301, 86 Stat. 1329, 1465 (1972)). Although the predominant focus of the legislation was benefits

abled under the Social Security Act. Before 1990, a child (under age eighteen) was "disabled" if he or she suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an adult from working. *See* 42 U.S.C. § 1382c(a)(3) (1982). On February 20, 1990, the United States Supreme Court decided *Sullivan v. Zebley,* 493 U.S. 521, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). In *Zebley,* the Supreme court invalidated regulations requiring a medical "listings-only" approach to child SSI disability claims and held that, in addition to evaluating claims based on listed impairments, the Commissioner must adopt a functional approach to child disability claims, similar to the system in place to evaluate adult claims. *See Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000) (citing *Zebley,* 493 U.S. at 530–32, 110 S.Ct. 885). After *Zebley,* the Commissioner "substantially liberalized" the childhood SSI eligibility regulations to provide for an individualized functional analysis ("IFA"). *See Haws ex rel. Haws v. Apfel,* 61 F.Supp.2d 1266, 1272 (M.D.Fla.1999).

### 1. *Personal Responsibility and Work Opportunity Reconciliation Act of 1996*

On August 22, 1996, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRAWORA"), which amended the statutory standard for children seeking SSI

benefits based on disability. *See* § 211(a) of Pub.L. 104–193, 110 Stat. 2105, 2188–89 (codified at 42 U.S.C. § 1382c(a)(3)(C)). The new standard and its accompanying regulations were more stringent·than their pre-PRAWORA counterparts, requiring a greater showing from an SSI disability claimant. *See Harris,* 209 F.3d at 419 & n. 36. Under the revised standard, a child seeking SSI benefits based on disability will be found disabled if he or she has a medically determinable impairment "which results in marked and severe functional limitations," and which meets the statutory duration requirement. *See* 42 U.S.C. § 1382c(a)(3)(C) (1994 & Supp. II 1996). Additionally, the PRAWORA eliminated the use of the IFA. *See* 20 C.F.R. §§ 416.924d, 416.924e (1996). The PRAWORA also removed references to "maladaptive behavior" from specified sections of the SSA's Listing of Impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* § 211(b)(1)-(2) of Pub.L. 104–193, 110 Stat. at 2189.

### 2. *Interim Final Rules*

On February 11, 1997, the SSA published interim final rules to implement the childhood disability provisions of the PRAWORA. *See* 62 Fed.Reg. 6408. The interim final rules deleted references to the former standard of "comparable severity" and made other revisions to the rules, including those related to the elimination

---

for adults, Congress included a provision making disabled children eligible for SSI payments, as well. *See id.* (citing 86 Stat. at 1471). Congress has never clearly established the precise purposes of SSI for children. *See id.* at 90. The official legislative history of the 1972 Act states:

[D]isabled children who live in low-income households are certainly among the most disadvantaged of all Americans and ... they are deserving of special assistance in order to help them become self-supporting members of our society. Making it possible

for disabled children to get benefits under this program, if it is to their advantage, rather than under the programs for families with children, would be appropriate because their needs are often greater than those of nondisabled children. The bill, accordingly, would include disabled children under the new program. Parents' income and resources would be taken into account ....

*See id.* (quoting H.R.Rep. No. 92–231, at 147–48, reprinted in 1972 U.S.C.C.A.N. 4989, 5133–34).

of the IFA and the deletion of references to "maladaptive behavior" in the specified sections of the listings. The interim final rules also defined the statutory standard of "marked and severe functional limitations" in terms of "listing-level severity." *See* 20 C.F.R. §§ 416.902, 416.906, 416.924(a) (2000). Moreover, the interim final rules established a new sequential evaluation process for determining disability for children. Under this three-step process, a child was required to show:

> (1) he or she was not engaged in substantial gainful activity (*i.e.,* not working);
>
> (2) he or she had a "severe" impairment or combination of impairments; and
>
> (3) his or her impairment or combination of impairments was of listing-level severity, that is, the impairment(s) met, medically equaled, or functionally equaled the severity of an impairment in the listings.

*See* 20 C.F.R. § 416.924 (2000).

The interim final rules provided four methods for determining functional equivalence, the primary and most frequently used method being whether a child had marked limitations in two broad areas of functioning or an extreme limitation in one of such areas. *See* 20 C.F.R. § 416.926a(b) (2000). In this case, the ALJ rendered his decision on September 19, 2000, in accordance with the interim final rules. That is, in determining whether R.J.'s ADHD and/or Learning Disorder were of "listing-level severity," the ALJ evaluated the impact of R.J.'s impairment to his functional capacity by performing an analysis of the following five broad areas of development: (1) cognitive/communicative functioning; (2) motor functioning; (3) social functioning; (4) personal functioning; and (5) concentration, persistence, or pace. (R. 15–18). The ALJ found, based on the medical and other objective evidence of record as well as the hearing testimony, that in the cognition/communication area of development, R.J. had marked limitation of functioning; however, R.J. did not have marked or extreme limitations in any other areas of functioning. (R. 15–19).

### 3. *Final Rules*

On September 11, 2000, the SSA published its final rules, which became effective on January 2, 2001, for determining childhood disability. *See* 65 Fed.Reg. 54,-747, corrected by 65 Fed.Reg. 80,307. The final rules revised the interim final rules. Significantly, the final rules continue to define the statutory standard of "marked and severe functional limitations" in terms of "listing-level severity." The final rules continue to follow the three-step sequential evaluation:

> (1) whether the child is doing substantial gainful activity;
>
> (2) if not, whether the child has a medically determinable "severe" impairment or combination of impairments; and
>
> (3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 2. .

*See* 20 C.F.R. § 416.924(b)-(d) (2001 & Supp.2003); *accord Sykes v. Barnhart,* 84 Fed.Appx. 210, 213 (3d Cir.2003); *Elam ex rel. Golay v. Commissioner of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir.2003). The final rules, however, simplify the interim final rules by replacing the four methods for determining the functional equivalence with a single method. *See* 65 Fed.Reg. at 54,755 & 54,782. Under the final rules, whether a child meets the "listing-level severity" standard is dependent on whether the child has marked limitations in two broad areas of development or functioning

or extreme limitation in one of those areas. *See* 20 C.F.R. § 416.926a (2001).

Additionally, the final rules rename the broad areas of functioning into what the final rules call "domains," and incorporate features of the three methods of functional equivalence that were deleted from the final rules.[7] The final rules also add a new domain, "health and physical well-being." *See* 20 C.F.R. § 416.926a(1) (2001). Thus, under the final rules, there are six domains used to determine a child's functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. *See id.* Although the final rules revise some of the methodology, the basic standard for determining functional equivalence remains the same in the final rules. Specifically, to establish functional equivalence, a child must have a medically determinable impairment or combination of impairments that results in marked limitations in two domains or an extreme limitation in one domain. *See* 20 C.F.R. § 416.926a(d) (2001).

Effective January 2, 2001, the final rules apply to claims pending at any stage of the administrative review process, including claims that are pending administrative review after remand from a federal court. *See* 65 Fed.Reg. at 54,750. The SSA explained in its preamble to the final rules, "[w]ith respect to claims in which we have made a final decision, and that are pending judicial review in Federal court, we expect that the court's review of the Commission-er's final decision would be made in accordance with the rules in effect at the time of the final decision." *See id.* at 54,750–54,-751. Thus, even if an ALJ had ruled under the interim final rules, any further administrative review (*e.g.,* review by the Appeals Council) that took place after January 2, 2001, would be governed by the final rules.

Here, the ALJ rendered his decision on September 19, 2000, before the effective date of the final rules; as such, his analysis was in accordance with the interim final rules. The Commissioner's final administrative decision, however, was rendered on September 24, 2002, when the Appeals Council declined to review the ALJ's determination. (R. 6–8). Mindful of the effective date of the final rules, the Appeals Council noted in its decision that it had "considered the final regulations, effective January 2, 2001, implementing the childhood disability provisions of Public Law 104–193. The new regulations do not provide a basis to change the [ALJ's] decision." (R. 6). Thus, the Court will apply the SSA's final rules in reviewing the ALJ's decision.

**B.  *Standard of Review***

**1.  *Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support

---

7.  For example, a former area of functioning was entitled "concentration, persistence, or pace." *See* 20 C.F.R. § 416.926a(c)(4)(vi) (2000). Under the final rules, this domain is now entitled "attending and completing tasks" and incorporates aspects of two prior areas of functioning such as "responsiveness to stimuli" and portions of the former area

"concentration, persistence, or pace." Under the domain of "attending and completing tasks," the SSA now considers how well a child is able to focus and maintain attention and how well a child begins, carries through, and finishes activities, including the pace at which the child performs such activities. *See* 20 C.F.R. § 416.926a(h) (2001).

the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir.2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL–CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000).

## 2. *Administrative Determination*

[1] Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to sup-

port the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842; *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999).

[2] When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir.2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Masterson*, 309 F.3d at 272.

## C. *ALJ's Determination*

An ALJ must engage in a three-step sequential process in evaluating whether a child is disabled and eligible for SSI benefits:

(1) whether the child is doing substantial gainful activity;

(2) if not, whether the child has a medically determinable "severe" impairment or combination of impairments; and

(3) if so, whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.

See 20 C.F.R. § 416.924(b)-(d); *accord Sykes,* 84 Fed.Appx. at 213; *Elam ex rel. Golay.,* 348 F.3d at 125. To determine whether an impairment is functionally equivalent to a listing, the ALJ must determine that the impairment results in a marked limitation in two domains of functioning or an extreme limitation in one domain. *See* 20 C.F.R. § 416.926a(a); *accord Phifer ex rel. Phifer v. Commissioner of Soc. Sec.,* 84 Fed.Appx. 189, 191 (3d Cir.2003). The domains which the ALJ is to analyze are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.[8] *See id.* (citing 20 C.F.R. § 416.926a(b)(1)). A marked limitation is present where the impairment interferes seriously with one's ability to "independently initiate, sustain, or complete activities." *See id.* (citing 20 C.F.R. § 416.926a(e)(2)(i)). An extreme limitation is present where one's impairment "interferes very seriously with [one's] ability to independently initiate, sustain, or complete activities." *See id.* (citing 20 C.F.R. § 416.926a(e)(3)(i)).

In this case, the ALJ found that, although R.J. was not working and his ADHD and Learning Disorder were severe impairments, R.J.'s condition did not meet, medically equal, or functionally equal the severity of an impairment listed in the regulations. Accordingly, the ALJ concluded that R.J. was not disabled under the Act. (R. 18–19). This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson,* 309 F.3d at 272; *Watson,* 288 F.3d at 215; *Myers,* 238 F.3d

at 619; *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir.2000); *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994), *cert. denied,* 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). Any conflicts·in the evidence are to be resolved by the ALJ and not the court. *See Newton,* 209 F.3d at 452; *Brown,* 192 F.3d at 496; *Martinez v. Chater,* 64 F.3d 172, 174 (5th Cir.1995); *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir.1990).

### D. *Issues Presented*

Jefferson contends that the ALJ did not apply the correct legal standard in determining that R.J. did not functionally equal the listings. Specifically, Jefferson contends that the ALJ erred by using the broad areas of development (*e.g.,* cognitive/communication, motor, social, personal development, and concentration, persistence, or pace) to determine whether R.J. "met" a listing. According to Jefferson, the ALJ should have determined whether R.J. "functionally equaled" a listing using the six domains set forth in 20 C.F.R. § 416.926a(1). Jefferson asserts that the record evidence demonstrates that R.J. has marked limitations in at least two developmental areas or domains and, thus, is disabled. Next, Jefferson argues that substantial evidence does not support the ALJ's finding that R.J. does not meet Listing 112.11. Similarly, in her third point of error, Jefferson maintains that R.J.'s limitations functionally equal Listing 112.11.

### E. *Review of the ALJ's Decision*

#### 1. *Standard Applied by ALJ*

Jefferson appears to suggest that the ALJ employed the wrong analysis to de-

---

8. As noted above, this Court will apply the SSA's final rules in reviewing the ALJ's decision. These rules define the statutory standard of "marked and severe functional limitations" in terms of "listing-level severity," as did the interim rules.

termine whether R.J. met or functionally equaled a listing. According to Jefferson, the ALJ erred by discussing five broad areas of development (*i.e.*, cognitive/communication, motor, social, personal development, and concentration, persistence, or pace) for meeting a listing. Jefferson contends that these areas are utilized to determine whether R.J. *met* a listing and not to determine whether R.J. *functionally equaled* a listing. Jefferson maintains that the ALJ should have considered R.J.'s functional equivalence utilizing the six domains (*i.e.*, acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for yourself, caring for yourself, and health and well-being) set forth in 20 C.F.R. § 416.926a(1).

■ Contrary to Jefferson's contention, the ALJ employed the correct standard under the interim final rules in his analysis. Because the ALJ rendered his decision on September 19, 2000, it was appropriate for him to utilize the interim final rules, which included the five broad areas of functional development. It was not until January 2, 2001, when the final rules became effective, that the broad areas of functioning were renamed and reorganized into six domains. Notwithstanding, as set forth above, the Appeals Council considered the final regulations and found that the final regulations did not provide a ba-

sis for changing the ALJ's decision. (R. 6). Accordingly, Jefferson's contention that this case should be remanded due to the ALJ's alleged failure to follow the proper legal standard (*i.e.*, the final rules) is without merit.[9]

## 2. *ADHD*

Jefferson argues that substantial evidence does not support the ALJ's finding that R.J. does not meet Listing 112.11, pertaining to ADHD. Jefferson claims that, in addition to the ALJ's finding of marked impairment in R.J.'s cognitive/communication function (R. 16, 19), R.J. has a marked impairment in either social, personal development, or concentration, persistence, or pace.

Listing 112.11 provides, in pertinent part:

112.11 Attention Deficit Hyperactivity Disorder:

Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

(A) Medically documented findings of all three of the following:

(1) Marked inattention; and

(2) Marked impulsiveness; and

---

9. Although it was appropriate at the time the ALJ rendered his decision to apply the interim final rules and for the Appeals Council to utilize the final rules, the elements from the former "cognition/communication" category are now split between two domains: "acquiring and using information" and "interacting and relating." As other courts have found when faced with this situation, "it is unclear to this Court how exactly it should engage in a substantial evidence review." *See Kittles ex rel. Lawton v. Barnhart*, 245 F.Supp.2d 479, 492 (E.D.N.Y.2003) (finding that an "attempt to review the Commissioner's decision for substantial evidence utilizing the Final Rules is a bit like comparing apples and oranges, since the ALJ's decision was made under a completely different rule regime namely, the Interim Rules"); *accord Morgan ex rel. Morgan v. Barnhart*, No. CIV. A. 02–552 JR/DAR, 2004 WL 254577, at *9 (D.D.C. Feb.4, 2004) (remanding for rehearing and findings in accordance with the applicable regulations). Because this case is being remanded on other grounds, as set forth *infra*, on remand the ALJ should consider R.J.'s application for benefits under the final rules.

(3) Marked hyperactivity;

And

(B) ... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. The age-appropriate criteria in 112.02(B)(2) includes in relevant part:

112.02 Organic Mental Disorder

B. Select the appropriate age group to evaluate the severity of the impairment:

(2) For children (age 3 to attainment of age 18), resulting in at least two of the following:

(a) Marked impairment in age-appropriate cognitive/communication function . . . .;

(b) Marked impairment in age-appropriate social functioning . . . .;

(c) Marked impairment in age-appropriate personal functioning . . . .; or

(d) Marked difficulties in maintaining concentration, persistence or pace.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(B)(2)(a)-(d).

**a.** *Social Functioning*

With regard to social functioning, Listing 112.00(C)(2)-(4),[10] addressing mental disorders, provides as follows:

112.00(C)(2)(b) Preschool children (age 3 to attainment of age 6)

Social functioning refers to a child's capacity to form and maintain relationships with parents, other adults, and peers. Social functioning includes the ability to get along with others (*e.g.,* family members, neighborhood friends, classmates, teachers). Impaired social functioning may be caused by inappropriate externalized actions (*e.g.,* running away, physical aggression-but not self-injurious actions, which are evaluated in the personal area of functioning), or inappropriate internalized actions (*e.g.,* social isolation, avoidance of interpersonal activities, mutism). Its severity must be documented in terms of intensity, frequency, and duration, and shown to be beyond what might be reasonably expected for age. Strength in social functioning may be documented by such things as the child's ability to respond to and initiate social interaction with others, to sustain relationships, and to participate in group activities. Cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity, appropriate to a child's age, also need to be considered. Social functioning in play and school may involve interactions with adults, including responding appropriately to persons in authority (*e.g.,* teachers, coaches) or cooperative behaviors involving other children. Social functioning is observed not only at home but also in preschool programs.

112.00(C)(3) Primary school children (age 6 to attainment of age 12).

The measures of function here are similar to those for preschool-age children except that the test instruments may change and the capacity to function in the school setting is supplemental information. Standardized measures of academic achievement ... may be helpful in assessing cognitive impairment. Problems in social functioning, especially in the area of peer relationships, are often observed firsthand by teachers and school nurses. As described in

---

**10.** Because R.J. was 11 years old when the application for SSI benefits was filed, and was 13 years old at the time of the administrative hearing, it is necessary to review the listings relating to both primary school children and adolescents. (R. 14).

112.00D, Documentation, school records are an excellent source of information concerning function and standardized testing and should always be sought for school-age children.

112.00(C)(4) Adolescents (age 12 to attainment of age 18)

Testing instruments appropriate to adolescents should be used where indicated. Comparable findings of disruption of social function must consider the capacity to form appropriate, stable, and lasting relationships. If information is available about cooperative working relationships in school or at part-time or full-time work, or about the ability to work as a member of a group, it should be considered when assessing the child's social functioning. Markedly impoverished social contact, isolation, withdrawal, and inappropriate or bizarre behavior under the stress of socializing with others also constitute comparable findings.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(2)-(4).

After considering the above Listing, the ALJ found that R.J. had moderate but less than marked limitation of functioning. (R. 17). The ALJ commented that the record indicated that R.J. hit his head constantly, and carried a pillow with him to prevent him for injuring himself when banging his head. (R. 17, 50). He further noted that the record revealed that R.J. had pushed another child at school down a flight of stairs, had thrown food at school, had difficulty remaining in his seat, and was highly inattentive during class. (R. 17, 51, 53, 212). R.J.'s mother had been called to his school four times in 1999 due to poor conduct. (R. 17, 54). The ALJ found that, at home, R.J. sometimes started fires. (R. 17, 52). The ALJ noted, however, that R.J. appeared to get along fairly well with

his older brother,[11] that he did not take a pillow to school, and that he had not ever been hospitalized. (R. 17, 62).

Jefferson contends that there is ample evidence, in addition to that previously cited by the ALJ, demonstrating that R.J. has a marked limitation in social functioning. This Court agrees. Specifically, R.J.'s third-grade (1995) teacher for science, social studies and math, Barbara Robertson, stated:

> The child can not (sic) function or interact with his peers at long periods because he begins crying, talking and needs an escape to settle himself. When [R.J.] is on medication he is still out of control at time. Fights if he is touched or talked about. He doesn't function well with his peers.

(R. 117). Moreover, Jefferson testified at the hearing that R.J. did not get along well with other children in his age group and had no friends at school. (R. 51). According to Jefferson, R.J. thought everyone was talking about him or picking on him and would fight them. (R. 51). She further testified that R.J. had pulled a knife on his brother and sister. (R. 51, 55). Most significantly, a comprehensive evaluation at the Clinic for Attention Problems at Texas Children's Hospital dated January 22 and 23, 1997, revealed in the adaptive functioning behavioral assessment:

> [R.J.'s] level of adaptive functioning was assessed in an interview with Ms. Jefferson, using the Vineland Adaptive Behavior Scales. The Vineland measures personal and social sufficiency in the following three domains: communication, involving the skills required for receptive, expressive, and written language; daily living skills, including the

---

11. The ALJ cited to exhibit B–5F/31 for the proposition that R.J. got along fairly well with his older brother (R. 17); however, the nota-tion in this exhibit refers to R.J. doing better since he had been linked to the Big Brother program. (R. 229–230).

practical skills that are needed to take care of one's self and contribute to a household; and socialization, which pertains to those skills needed to get along with others.

\* \* \* \* \* \*

[R.J.'s] social skills were well below age-expected levels in the areas of interpersonal relationships, play and leisure time skills, and coping skills. According to his mother, [R.J.] has significant difficulty getting along with peers and he is not well liked by other children. In addition, he does not independently weigh the consequences of his actions before making decisions and Ms. Jefferson reports that he rarely apologizes for mistakes or errors in judgment.

(R. 216). In the adaptive behavior evaluation, R.J.'s score in the socialization domain was age-equivalent of 2 years, 5 months. (R. 225). At the time of the evaluation, January 1997, R.J. was 9 years, 6 months of age. (R. 220). Thus, in the socialization domain, R.J. was 7 years, 1 month behind his chronological age.

▬▬ Listing 112.00 provides, in pertinent part, that "[w]hen standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked restriction." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C); *see also* 20 C.F.R. §§ 416.926a(e)(1)(ii), 416.926a(e)(2)(ii)-(iii), 416.926a(e)(3)(iii). In his decision, the ALJ disregarded the results of the Vineland Adaptive Behavior Composite [12] and failed to explain his departure from the mandates of 112.00(C) ("[w]hen standardized tests are used as the measure of functional parameters, a valid score that is two standard deviations below the norm for the test will be considered a marked

restriction"). Although, in interpreting the evidence and developing the record, the ALJ need not discuss every piece of evidence, he may not ignore evidence that does not support his decision especially when that evidence is "significantly probative." *See Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir.2001). Here, the ALJ's opinion does not sufficiently discuss the conflicting evidence regarding R.J.'s impairments; hence, the ALJ's decision that R.J.'s limitations in the area of social functioning are only moderately impaired is not supported by substantial evidence.

### b. *Personal Functioning*

With regard to social functioning, Listing 112.00(C), addressing mental disorders, provides as follows:

112.00(C)(2)(c) Personal function. Personal functioning in preschool children pertains to self-care; *i.e.*, personal needs, health, and safety (feeding, dressing, toileting, bathing; maintaining personal hygiene, proper nutrition, sleep, health habits; adhering to medication or therapy regimens; following safety precautions). Development of self-care skills is measured in terms of the child's increasing ability to help himself/herself and to cooperate with others in taking care of these needs. Impaired ability in this area is manifested by failure to develop such skills, failure to use them, or self-injurious actions. This function may be documented by a standardized test of adaptive behavior or by a careful description of the full range of self-care activities. These activities are often observed not only at home but also in preschool programs.

112.00(C)(4)(a) Personal functioning in adolescents pertains to self-care. It is

---

**12.** In fact, the ALJ fails to mention in his decision the results of any of the standardized tests which appear in the record. (R. 112–114, 176, 213–216, 220–225, 267, 293–297).

measured in the same terms as for younger children, the focus, however, being on the adolescent's ability to take care of his or her own personal needs, health, and safety without assistance. Impaired ability in this area is manifested by failure to take care of these needs or by self-injurious actions. This function may be documented by a standardized test of adaptive behavior or by careful descriptions of the full range of self-care activities.

See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 112.00(C)(2)(c), 112.00(C)(4)(a).

The ALJ found that R.J. had a moderate but less than marked limitation in personal development. (R. 17). Citing to a neuropsychological evaluation dated January 2000, the ALJ noted that R.J. did not dress himself or brush his teeth until approximately 8 years of age, and had to be rocked to sleep from infancy until age 9 years. (R. 17, 291). The ALJ did not make any other findings in this area of development.

Jefferson contends that the record supports that R.J. has marked limitations in the area of personal development. Specifically, under the Daily Living Skills Domain of the Vineland Adaptive Behavior Composite, R.J. scored age-equivalent of 3 years, 1 month, which was a discrepancy of 6 years, 5 months from his chronological age at the time of the test. (R. 225). Additionally, Jefferson testified that R.J. has smelled the fumes from the tailpipe of his grandmother's car, put his fingers in fan blades, and pulled knives on his siblings. (R. 54–55). Jefferson further testified that she has to help R.J. take a bath and make him brush his teeth. (R. 57–58). Finally, Jefferson contends that the ALJ mischaracterized the selected portion of the neuropsychological evaluation he relied upon. (R. 17, 291). Indeed, a full review of the 2000 neuropsychological evaluation

reveals R.J.'s personal development limitations as more significant.

For several years, [R.J.] has been displaying a number of behaviors at home and at school that have been quite worrisome to his mother. For example, [R.J.] needed to be rocked to sleep from the time he was an infant until 9 years of age. Presently, [R.J.] rocks himself to sleep but must lay his head on his mother's lap to do so. In the evenings, [R.J.] reportedly "sees" his deceased grandparents. In the past, [R.J.] had been observed to interact with several different imaginary characters. [R.J.] has recently developed the habit of doing jumping jacks at home and at school in order to "calm down." [R.J.'s] self-help skills are significantly delayed. [R.J.] did not dress himself or brush his teeth until he was approximately 8 years of age. He began displaying significant temper-tantrums at approximately age 2 and these have continued into the present. For example, his mother cannot take him shopping with her because he has a tendency to lay on the floor and become quite silly or alternatively display a temper-tantrum if he is not permitted to buy something he desires. For these same reasons, his mother is unable to leave him with other family members.

(R. 291).

▊ While the Court recognizes that even a "sketchy opinion" is sufficient if it assures the Court that an ALJ considered the important evidence and enables the Court to trace its reasoning. See Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 787 (7th Cir.2003). In light of the ALJ's failure in this case to mention R.J.'s Vineland Adaptive Behavior Composite scores in the domain of daily living and his conclusory findings, the ALJ's decision that R.J.'s limitations in the area of personal

functioning are only moderately impaired is not supported by substantial evidence.

### c. *Concentration, Persistence, or Pace*

With regard to concentration, persistence, or pace, Listing 112.00(C), addressing mental disorders, provides as follows:

112.00(C)(2)(d) Concentration, persistence, or pace. This function may be measured through observations of the child in the course of standardized testing and in the course of play.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(2)(d).

The ALJ found that "in the concentration, persistence, or pace areas of development, the claimant has moderate but less than 'marked' limitation of functioning." (R. 18). The ALJ did not cite to any record evidence or provide any insight as to how this conclusion was reached. Jefferson argues that the record clearly demonstrates that R.J. has a marked impairment in the area of functioning. A teacher's notation in 1996 revealed that R.J. spoke out, had inappropriate behavior, and was unable to keep still. (R. 134).

In 1997, it was reported in R.J.'s comprehensive evaluation at the Clinic for Attention Problems at Texas Children's Hospital that "Ms. Jefferson's responses to child behavior questionnaires which were obtained during his evaluation at the clinic for attention problems indicated significant problems with inattention, impulsivity, and physical restlessness." (R. 216). During the evaluation, R.J. was observed to be "constantly in motion and if required to remain in his chair, he would rock back and forth excessively." (R. 213). It was reported that the testing procedures took longer because R.J. took frequent breaks and it was difficult for R.J. to sustain his attention for long periods of time. (R. 213). An assessment (*i.e.,* Gordon Diagnostic System) of R.J.'s ability to focus and to sustain his attention, without verbal cues or monitoring, suggested he had significant problems with his ability to sustain his attention. (R. 215). It was further noted that R.J. exhibited problems with impulsivity. (R. 215).

In a psychiatric evaluation conducted in February 1998 by Depelchin Children's Center, it was noted that:

[R.J.'s] teachers report that he is impulsive and distractible and has diminished attention and diminished concentration. He is reported to be hyperactive. He is reported to have great difficulty listening to instructions from his teachers.

(R. 278). With respect to his mental status, it was further observed that his attention and concentration were diminished. (R. 279).

During the 2000 neuropsychological evaluation, it was reported that on the second day of testing R.J. was "quite nervous because he became aware that he was being 'tested' and periodically needed to get out of his seat to do jumping jacks in order to calm himself down." (R. 293). An assessment (*i.e.,* the Underlining Test) of R.J.'s ability to independently focus and sustain his attention revealed both problems with inattention as well as a tendency to respond somewhat impulsively. (R. 295). The pediatric neuropsychologist summarized her findings, in relevant part, as follows:

[R.J.'s] responses to measure of personality development and emotional functioning reveal that he is an exceedingly anxious and, at times, a depressed young man. [R.J.'s] anxiety appears to be long-standing in nature. [R.J.'s] ability to cope with his anxiety, however, is very poorly developed. Indeed, [R.J.] has difficulty managing even the stresses of daily living. He often adopts the

self-soothing strategies of a much younger child, which have the unfortunate effect of further isolating him from his peers. At times, [R.J.'s] anxiety has a direct and highly disorganizing affect on the quality of his thinking. Thus, while the present evaluation revealed no evidence of a formal thought disorder, at times [R.J.'s] thinking becomes highly disorganized. The disorganization in his thinking is manifested in a variety of behaviors that range from exacerbation in his inattention on the one hand to difficulty distinguishing between the contents of his fantasy life from reality. [R.J.'s] anxiety has become such an integral part of his personality organization that he is beginning to exhibit some traits characteristic of individuals with histrionic personality disorders. The long-standing and pervasive nature of [R.J.'s] anxiety and its manifestation in his behavior undoubtedly explains why Ritalin alone was not effective in improving his attention and concentration. (R. 298).

■■ The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council. *See Newton,* 209 F.3d at 455. If there is one fundamental principle guiding judicial review of an ALJ decision in a Social Security case, it is that an ALJ may not ignore evidence inconsistent with his or her opinion without explanation. *See Martin v. Apfel,* 118 F.Supp.2d 9, 15 (D.D.C.2000); *accord Morgan ex rel. Morgan,* 2004 WL 254577, at *7. In this instance, the ALJ failed to set forth any reasons for his determination that R.J. was only moderately limited in the area concentration, persistence, or pace. Instead, without the assistance of a medical ex-

pert,[13] the ALJ summarily made this determination. Given the ALJ's incomplete analysis and the probative medical evidence indicating that R.J. had marked levels of inattention, impulsiveness, and hyperactivity, the ALJ's finding that R.J. was only moderately limited in this area is not supported by substantial evidence. *See Trudell ex rel. Bushong v. Apfel,* 130 F.Supp.2d 891, 895 (E.D.Mich.2001) (rejecting ALJ's finding that child claimant had only moderate limitation in concentration domain and noting that "[a] substantiality of evidence evaluation does not permit a selective reading of the record").

### d. *Motor Development*

■ With regard to motor development, Listing 112.00(C)(2) provides, in pertinent part:

After 36 months, motor function is no longer felt to be a primary determinant of mental function, although, of course, any motor abnormalities should be documented and evaluated.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C)(2). The ALJ found that R.J. had "no limitation" in the area of motor development. (R. 16). Jefferson argues that the ALJ ignored the Grooved Regboard Test administered to R.J. in January 1997, showing that R.J. was "well below" age-expected level in both his dominant right hand and non-dominant left hand. (R. 222). R.J. was observed to have a "poor pencil grip" causing "written tasks to be arduous and difficult." (R. 213). Additionally, it was noted in the January 2000 neuropsychological evaluation that "R.J.'s fine motor speed and dexterity, as assessed by the Grooved Regboard Test, was below age-

---

13. "An administrative law judge may not draw upon his own inferences from medical reports." *Nevland v. Apfel,* 204 F.3d 853, 858 (8th Cir.2000). Thus, it may be of benefit to the ALJ to have a medical expert, specializing in pediatric neuropsychology, present at any new administrative hearing to properly review the medical evidence.

expected levels bilaterally . . . ." (R. 295). The ALJ's omission of any discussion of this test renders his finding of "no limitations" in this area as not supported by substantial evidence.

### 3. Credibility Assessment

Jefferson next argues that the ALJ erred by failing to indicate the basis for his credibility assessment. "[A]n ALJ must make specific findings concerning the credibility of the parent's testimony." *Briggs ex rel. Briggs,* 248 F.3d at 1239; *accord Ragan v. Barnhart,* No. 03–7076, 2004 WL 249629, at *3 (10th Cir. Feb.11, 2004). In this regard, SSR 96–7p [14] provides, in pertinent part:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996); *see also* 20 C.F.R. § 416.929; *see generally Scharlow v. Schweiker,* 655 F.2d 645, 648 (5th Cir.1981) (ALJ erred by failing to make specific finding regarding claimant's allegation of pain). Without an adequate explanation, neither the claimant nor subsequent reviewers will have a fair sense of how the claimant's testimony was weighed. *See Zurawski v. Halter,* 245 F.3d 881, 887 (7th

Cir.2001). Thus, the ALJ is required to state which of Jefferson's complaints he rejected and why such complaints were unsupported by the record. *See Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000). Accordingly, the ALJ must build an "accurate and logical bridge from the evidence to his conclusion." *Id.*

■ At the administrative hearing, Jefferson testified regarding R.J.'s limitations. (R. 41–64). In his decision, the ALJ's entire credibility assessment of Jefferson reads:

> Subjective complaints are considered credible only to the extent that they are supported by the evidence of record as summarized in the text of this decision.

(R. 19). This is precisely the kind of conclusory determination that SSR 96–7 prohibits. Indeed, the ALJ's discussion of Jefferson's credibility is conclusory and is not linked to specific medical evidence. The Court finds the ALJ's vague finding to be devoid of any analysis that would enable meaningful judicial review. The ALJ failed to follow the correct legal standard and there is insufficient evidence indicating that it resulted in harmless error. On remand, the ALJ should conduct a proper analysis, with specific consistent findings, concerning Jefferson's credibility.

### III. Conclusion

It is, therefore, **RECOMMENDED** that Jefferson's Motion for Summary Judgment (Docket Entry No. 18) be **GRANTED.** Further, it is

**RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 20) be **DENIED.** Further, it is

---

**14.** Social Security Administration Rulings ("SSR") are not binding on this Court, but they may be consulted when the statute at issue provides little guidance. *See generally Myers,* 238 F.3d at 620.

RECOMMENDED that the case be REVERSED and REMANDED, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing to fully address, under the final rules and with the assistance of a medical expert, the following: R.J.'s functional equivalence (considering all six domains) and the requirements of Listing 112.11; updated medical and/or school records, including R.J.'s standardized test scores; the weight given to the testimony of Jefferson; and, the testimony of a medical expert. Finally, it is

RECOMMENDED that this matter be DISMISSED from the dockets of this Court.

The Clerk shall send copies of the Memorandum and Recommendation to the respective parties. The parties have ten (10) days from receipt to file specific, written objections to the Memorandum and Recommendation. See FED. R. CIV. P. 72. Absent plain error, the failure to file objections bars an attack on the factual findings, as well as the legal conclusions, on appeal. The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing party and to the chambers of the magistrate judge, P.O. Box 610205, Houston, Texas 77208–0070.

## MEMORANDUM AND ORDER

On March 12, 2004, Magistrate Judge Calvin Botley issued a Memorandum and Recommendation [Doc. # 22] on Plaintiff Sherry Jefferson's ("Jefferson"), on behalf of her minor son, R.J., and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner") cross-motions for summary judgment.

This Court has reviewed the Memorandum and Recommendation, noting that no objections have been filed, and the cross-motions for summary judgment filed by the parties. It is, therefore,

ORDERED that the Memorandum and Recommendation is ADOPTED as this Court's Memorandum and Order. It is further

ORDERED that Jefferson's Motion for Summary Judgment [Doc. # 18] is GRANTED. It is further

ORDERED that the Commissioner's Motion for Summary Judgment [Doc. # 20] is DENIED. It is further

ORDERED that the case is REVERSED and REMANDED, pursuant to "sentence four" of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to the Commissioner for a new hearing. It is finally

ORDERED that this matter be DISMISSED from the dockets of this Court.

## FINAL JUDGMENT

In accordance with the Memorandum and Order issued this day, it is hereby

ORDERED that Plaintiff Sherry Jefferson's ("Jefferson"), on behalf of her minor son, R.J., Motion for Summary Judgment [Doc. # 18] is GRANTED. It is further

ORDERED that Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), Motion for Summary Judgment [Doc. # 20] is DENIED. It is finally

ORDERED that this case is REVERSED and REMANDED to the Commissioner, pursuant to "sentence four" of the Social Security Act, 42 U.S.C. § 405(g).

This is a FINAL JUDGMENT.